**Arthur L. SCAGGS, Jr.,
Plaintiff–Appellant,**

v.

**CONSOLIDATED RAIL CORPORATION,
Defendant–Appellee.**

No. 92–3116.

United States Court of Appeals,
Seventh Circuit.

Argued May 12, 1993.

Decided Oct. 12, 1993.

a consist, which is comprised of four locomotives coupled together. Scaggs drove the consist to a particular area of the yard, then remained in the consist to watch and listen for oncoming railroad cars. (Tr. I/77; II/175–76). Meanwhile, another consist a short distance away started moving using the same track as the one on which Scaggs' consist was sitting. The driver of the moving consist, Thomas Ollier, was looking behind at a brakeman and did not see that he was closing in on the stationary consist. The second consist moved 75–100 feet at a speed of 3–5 miles per hour with its lights on and its bell ringing. (Tr. IV/662–77; IV/655–60). In spite of his look-out duties and the favorable weather conditions (it was a clear night) (Tr. II/173), Scaggs did not see the approaching consist. (Tr. II/183). The two consists collided. Ironically, the safety rule of the day at the yard was "when riding in a caboose or locomotive, expect a sudden shock or movement at any time." (Tr. II/185). Later, Conrail found that Ollier had broken a safety rule by not looking in the same direction as the moving consist and put him on unpaid leave for five days. (Tr. IV/724–25).

On impact, Scaggs was thrown out of the engineer's chair and on to the floor. (Tr. I/80). Ollier climbed out of his locomotive to see what happened. When he saw Scaggs get out of the other locomotive, he asked if Scaggs was all right. Scaggs answered affirmatively. (Tr. IV/681). Another employee from the moving consist asked Scaggs how he was feeling, and Scaggs again said he was feeling okay. (Tr. IV/752). Scaggs continued working after the accident, but a little later sought medical attention. (Tr. I/97). Another Conrail employee drove him to a local hospital emergency room. (Tr. I/98). Scaggs was examined by an emergency room doctor, Dr. Kirtley, who ordered x-rays. (Kirtley Dep. at 42). Dr. Kirtley diagnosed Scaggs as having an acute cervical strain. Dr. Kirtley gave Scaggs a soft cervical collar to help support his head, and prescribed a muscle relaxant and an anti-inflammatory drug for him. (Kirtley Dep. at 38–39). Dr. Kirtley recommended that Scaggs stay home from work for 5 days. (Kirtley Dep. at 44). None of the other workers on the consists were injured.

Andrew P. Sheff, Emil R. DiNardo, Charles G. Johnson (argued), Collins, Collins, Dinardo & Dolce, Buffalo, NY, for plaintiff-appellant.

Ronald J. Waicukauski (argued), James A. Mellowitz, White & Raub, Indianapolis, IN, for defendant-appellee.

Before BAUER, KANNE, and ROVNER, Circuit Judges.

BAUER, Circuit Judge.

Arthur L. Scaggs, Jr. sued Consolidated Rail Corporation ("Conrail") for negligence pursuant to 45 U.S.C. § 51 et seq., the Federal Employers' Liability Act ("FELA"). The case was tried before a jury, which ruled in favor of Conrail. Scaggs filed a motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. The district court denied the motions. Scaggs appeals the district court's denial of the motions as well as various evidentiary rulings.

I.

Arthur L. Scaggs, Jr. was a Conrail employee working as a brakeman at the Avon railyard in Indianapolis, Indiana in October 1988. On October 2, Scaggs was working on

Scaggs sought further medical treatment from his family physician. He saw Dr. Mandel, an osteopath, approximately sixty times between the collision and the trial. (Tr. III/499). Dr. Mandel's office submitted records to Conrail dated October 3, 1988 that also diagnosed Scaggs with an acute cervical strain. (Tr. III/506). The same document indicated that Scaggs could return to work on January 9, 1989, approximately three months later. That document and others stated that Scaggs could look forward to significant improvement of his condition. (Tr. III/513). At trial, Dr. Mandel claimed that his earlier diagnosis was incomplete. Dr. Mandel testified that Scaggs condition was more extensive, and that in addition to the acute cervical strain, Scaggs sustained a lumbar strain, a herniated lumbar disk, an ulnar nerve injury to his left elbow, and multiple contusions and abrasions. (Tr. III/515).

Conrail offered Scaggs company-provided medical and rehabilitative services. Scaggs declined these services, but he was treated by other physicians. Five of Scaggs' physicians testified at trial or their depositions were read into the trial record. The testimony of two orthopedic surgeons was particularly enlightening. Dr. Schaffer testified on Scaggs behalf. Dr. Schaffer wrote to Scaggs' referring physician that he believed Scaggs was "babying" himself and not participating in activities that were within his capability. He also found that Scaggs' weight hampered his recuperation. (Tr. III/386). When the complaints of pain persisted, Dr. Schaffer authorized a number of tests on Scaggs. He ordered magnetic resonance imaging ("MRI") of Scaggs' back. The MRI revealed a bulging disk. (Tr. III/363). Dr. Schaffer performed lumbar disk surgery on Scaggs after Scaggs' complaints of pain persisted. He testified that the surgery revealed that Scaggs had an extruded lumbar disk. (Tr. III/371–73). Dr. Schaffer examined Scaggs and gave him exercises to perform at home to improve his condition. When Scaggs did not improve, Dr. Schaffer believed Scaggs was not performing his exercises. (Tr. III/374). Dr. Schaffer also performed ulnar nerve surgery on Scaggs. The doctor testified that Scaggs' ulnar nerve

problem was attributable to the locomotive collision. (Tr. III/360). Dr. Schaffer testified that Scaggs was permanently, but not totally, disabled. (Tr. III/381–83). He stated that Scaggs should not return to heavy railroad work, but would be capable of performing other work. (Tr. III/384). When questioned about symptoms that Scaggs was complaining about long after the locomotive collision and the surgeries, Dr. Schaffer stated that those complaints did not correspond to Scaggs earlier complaints and were too distant in time to be related to the collision. (Tr. III/400–05).

Scaggs visited another orthopedic surgeon, Dr. Suelzer. Dr. Suelzer testified for Conrail. Dr. Suelzer examined Scaggs and performed a series of tests on him to determine the extent, if any, of his back injury. The results indicated that Scaggs was prevaricating. His complaints of pain were not in keeping with the physical evidence demonstrated by the tests. (Tr. V/831–40). Dr. Suelzer reviewed the MRI images of Scaggs' back, and determined that he had only a slightly bulging lumbar disk. Dr. Suelzer rated the bulge a two on a scale of one to five, with five representing the most severe. He testified that Scaggs' disk problem was not very severe. (Tr. V/842). He also testified that the exhibit that Dr. Schaffer used at trial to illustrate Scaggs' disk injury did not represent Scaggs' condition as revealed by the MRI. (Tr. V/842). Dr. Suelzer testified that Dr. Schaffer's medical report described a more severe injury than what the medical evidence gathered at the time of the collision suggested. (Tr. V/843–49). Dr. Suelzer also reviewed Scaggs' ulnar nerve condition. He stated that Scaggs' problem was congenital, not a result of the accident. (Tr. V/848). Dr. Suelzer testified that Scaggs' continued complaints of pain and problems associated with his hand were not a result of continued ulnar nerve problems. (Tr. V/850–52). Dr. Suelzer's testimony indicated that Scaggs was malingering.

Scaggs also saw a neurosurgeon, Dr. Hall, three months after the collision. Dr. Hall found no objective evidence to corroborate Scaggs complaints of pain in his legs. (Tr. VI/1045). He also found that Scaggs tested

normally for arm function. (Tr. VI/1046). Scaggs' subjective complaints of pain prompted Dr. Hall to order tests. (Tr. VI/1047). The tests revealed that as of January 13, 1989, Scaggs' possessed no objective signs of a ruptured disk. (Tr. VI/1052). Dr. Hall recommended that Scaggs participate in rehabilitative exercise therapy, not surgery, to combat his complaints of pain. (Tr. VI/1050).

Scaggs sued Conrail for negligence resulting in personal injuries, and Conrail began surveillance on Scaggs in light of the litigation. The surveillance produced no evidence that Conrail wished to present. For this reason, Conrail filed a motion in limine to bar references to the policies, practices, and procedures surrounding its surveillance, except for the direct observations of Scaggs during the course of the surveillance. (R. 37). Scaggs, however, wanted the evidence in. He claimed that it benefitted his case because the fruits (or lack thereof) of the surveillance did not support Conrail's defenses that Scaggs was malingering and that Scaggs failed to mitigate his damages. (R. 42). Conrail argued that the surveillance evidence was not relevant, but even if it was relevant, it was not probative under Federal Rule of Evidence 403. The district court granted Conrail's motion using a Rule 403 analysis to determine that the evidence was substantially more prejudicial and a waste of time than it was probative. (R. 51a/51b).

Scaggs also was barred from introducing other evidence. Scaggs sought to call an expert to testify to the speed of the moving consist and the force of impact that occurred when it hit the stationary consist. The expert was not allowed to testify under Federal Rule of Civil Procedure 37. Rule 37 allows the district court to bar expert testimony as a sanction for failure to make or cooperate in discovery.

At the close of trial, the jury was given verdict forms and sent to deliberate. The forms gave the jury three choices in their verdict. They could 1) rule in Scaggs' favor; 2) rule in Conrail's favor; or 3) find that Scaggs was contributorily negligent and award damages commensurate with Conrail's negligence. The jury selected option two, awarded no damages to Scaggs, and charged him with Conrail's cost of defending the lawsuit.

## II.

Scaggs appeals the denial of his post-trial motion, the Rule 37 sanction, and the decision to bar the surveillance evidence.

### A. Post Trial Motion:

■ A motion to set aside the verdict is made pursuant to Federal Rule of Civil Procedure 50(b). We review a Rule 50(b) motion *de novo,* considering the evidence in the light most favorable to the prevailing party and drawing all reasonable inferences in favor of the prevailing party. If the evidence overwhelmingly favors the moving party, then the verdict cannot stand. *Ross v. Black & Decker, Inc.,* 977 F.2d 1178, 1182 (7th Cir.1992). A motion for a new trial is made pursuant to Federal Rule of Civil Procedure 59(a). When reviewing a Rule 59(a) motion, we defer to the district court and reverse only if it has abused its discretion. In doing so, we determine whether the clear weight of the evidence is against the jury verdict, the damages are excessive, or for some other reason the trial was not fair to the moving party. *Walden v. Illinois Central Gulf R.R.,* 975 F.2d 361, 365 (7th Cir.1992).

■ With its verdict in favor of Conrail, the jury demonstrated that it found either that Scaggs was the sole cause of his injury or that Scaggs did not suffer an injury. To set aside their decision, Scaggs must show that Conrail is wholly or partly responsible for the circumstances leading up to the collision and that he suffered an injury as a result of the collision. To achieve success on appeal, Scaggs' evidence must overwhelmingly support this proposition. *Id.* at 365.

Scaggs argues that as a matter of law, Conrail negligently caused the collision because a Conrail employee, Ollier, broke a safety rule. Causation is a jury question. *Walden,* 975 F.2d at 365 (the 1939 FELA amendments required causation be determined by the jury). We acknowledged in *Walden* that in some situations causation might be a matter of law rather than a

matter of fact. *Id.* This is not one of those situations.

The evidence showed that Scaggs was seated in the engineer's chair on the consist. His duty was to watch for other railroad cars that were moving in his direction. The testimony established that the consist Ollier was driving traveled 75–100 yards moving only 3–5 miles per hour. The consist was very large and was equipped with blazing lights and a ringing bell. Despite these characteristics, Scaggs testified without explanation that he did not see or hear the consist approaching. Conrail, however, posed an explanation. On cross-examination, Conrail's attorney asked Scaggs if he was sleeping during the moments preceding the collision when he should have been watching for oncoming consists. Scaggs denied the suggestion. (Tr. II/188). The evidence showed that Scaggs seemed to ignore the safety rule of the day that warned employees to always be prepared for sudden movement when in a locomotive or a caboose.

Perhaps most significantly, Scaggs testimony at trial was impeached numerous times. For instance, Scaggs contradicted himself in his depositions and trial when he inconsistently testified about 1) whether he told other employees immediately following the accident that he felt okay (Tr. II/137); 2) whether his lantern broke when he fell out of the chair (Tr. II/178–79); 3) how he landed when he fell out of the chair (Tr. II/134–35); 4) how fast the moving consist was traveling (Tr. II/130–32); and 5) how frequently he performed back exercises recommended by Dr. Schaffer (Tr. II/291–292). The jury heard further evidence impugning Scaggs' truthfulness. Scaggs testified that during his recuperation he was primarily sitting and watching television between six and eight hours a day. He testified that he had not been out in his pedal boat or ridden his motorcycle since the accident. (Tr. II/314). Conrail responded by producing Scaggs' neighbor, Gregory Tierney, to testify that he saw Scaggs using a pedal boat in the nearby lake and riding a motorcycle. (Tr. VI/1121–22). Moreover, Scaggs could recall virtually no job applications or advertisements he answered. (Tr. II/209–12). The district court found that "Scaggs' credibility was decimated

by the defense case." (R. 501). The defense also produced considerable evidence that Scaggs was lying about the injuries he claimed to have received in the collision.

Scaggs testified that he told Dr. Kirtley that he was experiencing neck pain, muscle spasms, and numbness in his hand and arm when he was brought to the emergency room following the collision. (Tr. II/304). Dr. Kirtley's emergency room report reflects no such complaints. (Kirtley Dep. 25–29). The doctors who testified on Scaggs behalf were impeached or were tainted with the possibility of bias. Dr. Mandel, Scaggs' general practitioner, was impeached by records generated by his office that offered a different diagnosis and prognosis than the one he testified to at trial. Dr. Schaffer's testimony was weakened by his earlier observations that Scaggs was babying himself and not participating in exercises and therapy that would hasten any alleged recovery. Also, Dr. Schaffer testified that the pain Scaggs complained of when Dr. Suelzer tested him would "surprise" Dr. Schaffer in light of Scaggs condition as he knew it to be. (Tr. III/398). Dr. Schaffer testified that he never has seen discoloration or bruising attributed to muscle spasms, a condition that Scaggs claimed he suffered. (Tr. III/392–93). Finally, Dr. Schaffer testified that the neck pain Scaggs testified about at trial (which he claims to have experienced since the accident) was not related to the consist accident. (Tr. III/400–405).

It goes almost without saying that Dr. Suelzer's and Dr. Hall's testimony crushed Scaggs' claims. Their opinions clearly indicated that Scaggs was malingering. Moreover, the only injuries they diagnosed were based on Scaggs' subjective complaints of pain and stiffness. If the jury did not find Scaggs credible, it had no reason to believe he was injured at all. Dr. Kirtley's was the least serious diagnosis, and the jury could reject it completely if it believed Scaggs was lying. Also, Dr. Suelzer's testimony indicated that any disk injury that Scaggs possessed when he was operated on probably occurred after the collision.

When considering the evidence in the light most favorable to Conrail and drawing all

reasonable inferences in Conrail's favor, we do not believe that overwhelming evidence supports Scaggs case. Therefore, the district court did not err by denying the Rule 50(b) motion. Moreover, the clear weight of the evidence is not contrary to the jury verdict, and the district court did not abuse its discretion when it denied Scaggs' Rule 59(a) motion for a new trial.

*B.   Rule 37 Sanction:*

█ The district court has broad discretion when deciding if sanctions for discovery violations should be imposed. We will reverse that decision only if the district court abused its discretion. *Shine v. Owens–Illinois, Inc.,* 979 F.2d 93, 96 (7th Cir.1992). We have tracked the pretrial discovery timeline in this case. Scaggs' trial was originally set for November 26, 1990. On September 19, 1990, the defense moved for a continuance, (R. 29), which the plaintiffs heartily opposed. (R. 30). The motion was denied. On November 15, 1990, the defense again moved for a continuance, (R. 47), because the plaintiff had identified four new witnesses on November 13, 1990—just 13 days before trial. (R. 43). The district court granted the continuance, set a new discovery deadline for January 19, 1991, and stated that "[t]he purpose of this notice is to identify every issue which will be submitted for trial, and to provide the court with the information necessary to narrow the issues as much as possible prior to trial. This notice is not intended to expand the scope of this litigation." (R. 57). The district court set the trial for May 6, 1991.

On January 17, 1991 (two days before the close of discovery), Scaggs identified another witness, James Sobek. (R. 10). Sobek had never been identified as a witness in response to Conrail's interrogatories. When Sobek was identified, Scaggs stated:

> Mr. Sobek will testify as to what to a reasonable degree of certainty was the speed of the striking units at the time of impact assuming four different lengths of movement of the plaintiff's engines. That being 15', 20', 25' and 30'; and the potential G forces experienced in the [unit in

which Scaggs was seated] as a result of the impact and during the movement."

(Def.App. 46). On the same day, Scaggs submitted a fourth supplemental exhibit list citing a "[r]eport prepared by James Sobek of Wolf Technical Services, Inc." (R. 11). Five days later, Scaggs submitted a final statement of contentions and did not identify the speed of the locomotive as an issue. The statement did, however, allege general negligence of Conrail, its agents, servants, or employees. (R. 21).

At this point, Conrail requested Sobek's report. Conrail made written requests for the report in January and February. Unbeknownst to Conrail or the court, Sobek did not write the report until February 20. Conrail continued its requests for the report in March. On March 20, Scaggs' attorney told Conrail's attorney that no report existed. In its place, Conrail requested supplementary interrogatories of Sobek's putative testimony. Conrail received a short letter that informed it that Sobek would testify on accident reconstruction and would render an opinion about the speed of the moving consist and the impact to the stationary consist. (Def.App. 55). Five days later, Conrail deposed Sobek. Thirteen days later, Conrail moved to amend its witness list and add experts to respond to Sobek's testimony. Scaggs opposed the motion. The district court held a hearing on the issue, and barred Conrail from adding witnesses. (R. 58). Conrail then moved to bar Sobek from testifying as a sanction for noncompliance with the discovery deadlines. (R. 60). The district court granted the motion, and Scaggs went to trial without Sobek.

The parties and the district court refer to the March 1, 1991 deadline for exhibits and witnesses that was set in the court's notice of continuance as the deadline that applied to Sobek's identification. (R. 57). That deadline, however, applied to previously listed witnesses and exhibits, not witnesses and exhibits never before identified. Rather, new identifications needed to fall within the time period ending January 19, 1991 that closed discovery. Therefore, Scaggs' identification of Sobek came at the eleventh hour. Moreover, in January, Scaggs identified a report written by Sobek that did not exist

until February. Then, after Conrail's repeated attempts to obtain the report, Scaggs told Conrail in late March that no report existed. Conrail did not receive a supplemental interrogatory response setting out Sobek's testimony until the March 21 letter. This was the first statement Scaggs made that raised speed as a trial issue. Finally, Scaggs wanted to go to trial in November 1990, two months before identifying Sobek as a witness. In light of these circumstances, we believe it was well within the district court's discretion to sanction Scaggs by barring Sobek's expert testimony.

### C. Evidentiary Ruling:

▌ Conrail filed a motion in limine to limit the admission of evidence of Conrail's surveillance of Scaggs. The district granted the motion limiting admission, but qualified it by stating that Conrail's direct surveillance could be presented. (R. 51a–b). The district court's order read:

> [A]ll witnesses, parties and their attorneys shall refrain from mentioning, either directly or indirectly, in the presence of the jury, any information concerning the defendant's policies, practices, and procedures, concerning surveillance, including the practice of tracing motor vehicle license plate information, except to the extent of defendant's direct surveillance observations of the plaintiff.

(R. 51a). The court left an open window by stating that admissibility of surveillance evidence may change if its probative value increases during the trial. (R. 51a). The district court based its decision on Federal Rule of Evidence 403. Rule 403 provides that the district court may exclude relevant evidence if, *inter alia*, its probative value is substantially outweighed by the danger of unfair prejudice or time considerations. Fed. R.Evid. 403.

Despite the precautions, the jury learned of the surveillance. When Tierney, the neighbor, was cross-examined, Scaggs' attor-

ney asked him who contacted him regarding his testimony. Tierney offered a name and then concurred with Scaggs' attorney's statement that the person was a private detective. Scaggs' attorney then asked "Did he tell you about the surveillance they were conducting?" (Tr. VI/1126). Conrail objected, and Tierney did not answer the question.[1]

A district court has broad discretion to decide evidentiary issues. *Nachtsheim v. Beech Aircraft Corp.*, 847 F.2d 1261, 1267 (7th Cir.1988). In *Nachtsheim*, we held that when the district court has fully balanced the probative value against the potential prejudice, we will be especially hesitant to reverse a Rule 403 decision. *Id.* at 1268. Scaggs argues that he did not exceed the express terms of the district court's limiting order. He also argues that the decision limiting admission of the surveillance evidence was an abuse of the district court's discretion.

The district court discussed the probative value of the surveillance evidence in its memorandum accompanying the order restricting its admission. The court determined that the probative value was limited. Scaggs believed that the failure to find damaging evidence was probative on the malingering issue. The court found that Scaggs' plan to prove a negative with the lack of evidence was outweighed by concerns about prejudice and wasted time.

We believe the district court's decision was well within its discretion. The court recognized that evidence of no evidence was a waste of time in this case. The district court did not abuse its discretion when it substantially barred surveillance evidence pursuant to Rule 403.

### III.

The district court decisions are AFFIRMED.

---

1. The district court held that Scaggs improperly broached the surveillance issue. During a lengthy exchange outside the presence of the jury, the district court held that Scaggs exceeded the parameters of the limiting order, (Tr. VI/29), because the private investigator learned of Tierney through investigatory rather than surveillance duties. (Tr. VI/1125–29). The district court denied Conrail's subsequent motion to declare a mistrial. (Tr. 1137).