Hudson T. HARRISON and Harrison
Construction, Inc., Plaintiffs–
Appellees,

v.

DEAN WITTER REYNOLDS, INC.,
Defendant–Appellant.

No. 95–1970.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 6, 1995.

Decided March 20, 1996.

Rehearing and Suggestion for Rehearing
En Banc Denied May 20, 1996.*

* Judge Walter J. Cummings did not participate in the consideration of this petition.

Thomas P. Ward (argued), McBride, Baker & Coles; Eugene H. Ruark, Rooks, Pitts & Poust; and David C. Gustman, Freeborn & Peters, Chicago, IL, for Plaintiffs–Appellees.

Phil C. Neal, H. Nicholas Berberian (argued) and Mark T. Carberry, Neal, Gerber & Eisenberg, Chicago, IL, for Defendant–Appellant.

Before WOOD, Jr., and KANNE, Circuit Judges, and SHARP, Chief District Judge.**

HARLINGTON WOOD, Jr., Circuit Judge.

This securities fraud case charges a violation of Section 10(b) of the Securities Exchange Act of 1934 (the Act), 15 U.S.C. § 78j(b), and Section 20(a) of the Act, 15 U.S.C. § 78t(a). This panel is acquainted with the case, but different issues are raised in this second appeal. In the first appeal, 974 F.2d 873 (7th Cir.1992), *cert. denied,* 509 U.S. 904, 113 S.Ct. 2994, 125 L.Ed.2d 688 (1993) (*Harrison I*), we affirmed in part and reversed in part. The case had come to us on the grant of summary judgment in favor of defendant Dean Witter with respect to the claim raised under Section 20(a) of the Act. We reversed the grant of summary judgment and remanded for trial concluding on the question of control that:

> The alleged facts are sufficient to prevent our finding, as a matter of law, either that Dean Witter did not actually exercise control over the operations of Kenning and Carpenter in general or that Dean Witter did not possess the power or ability to control Kenning and Carpenter's transactions upon which the primary violation is predicated. Accordingly, it was error to grant Dean Witter's motion for summary judgment on the basis that Dean Witter was not a controlling person. We leave that determination to the factfinder.

974 F.2d at 881.

We further concluded on the issue of the conduct of Dean Witter that:

> Under the alleged facts of the present case we cannot say, as a matter of law, that

Dean Witter acted in good faith and neither directly nor indirectly induced the act or acts constituting the violation. This determination, too, must be left to the factfinder.

*Id.* at 882.

As to Harrison's original *respondeat superior* theory of liability, which has now disappeared from the case, we held that the district court exercising its diversity jurisdiction had correctly found that Dean Witter was not liable under *respondeat superior* for the state law vicarious liability claim which Harrison raised. The statutory issue arising under the federal act is now argued by Dean Witter to be governed by the prior ruling of this court on the *respondeat superior* state claim. Also gone from the case is the claim for the alleged negligent hiring of the two employees of Dean Witter directly involved.

Since *Harrison I,* a jury has found on all issues against Dean Witter and assessed damages. We now review that final judgment.

## ISSUES

Dean Witter raises three issues which must be addressed: *First,* Dean Witter argues that the district court erred in denying Dean Witter's motion for judgment as a matter of law on the question of control person liability. Dean Witter claims there was no legally sufficient evidentiary basis for the jury to find "control person liability" under Section 20(a) of the Act. In its view there was no showing that Dean Witter had the power or ability to control the particular transactions that allegedly violated Section 10(b) of the Act. *Second,* Dean Witter alleges the district court erred in denying its motion for a new trial on the basis that the evidence was insufficient for the jury to have found the justifiable reliance necessary to establish a primary securities fraud in violation of Section 10(b). *Third,* Dean Witter claims the district court erred in denying its motion for a new trial based on the exclusion by Judge Marovich of certain income tax evidence re-

---

** The Honorable Allen Sharp, Chief Judge of the Northern District of Indiana, sitting by designa-    tion.

lated to Harrison. Dean Witter argues that the excluded evidence was relevant to all three principal issues in this appeal.

## FACTUAL SUMMARY

In addition to the facts outlined in the first opinion reversing the grant of summary judgment, the jury in this case heard the fraud story in greater detail and, as always, had the opportunity to assess the credibility of the witnesses and to determine the weight to be accorded their testimony.

There is no dispute that Harrison was defrauded by John Kenning, a vice president of Dean Witter, and by John Carpenter, a registered salesperson for Dean Witter. Kenning, the more experienced in the brokerage business, was responsible for Carpenter, then twenty-seven years old, being employed by Dean Witter in 1983. When Kenning was hired by Dean Witter he insisted that Dean Witter also take his friend Carpenter as a "package deal." Richard Frost, Dean Witter's Boca Raton branch manager, bought that package, and trouble. Both Kenning and Carpenter worked closely together in that branch office. A couple of years after being hired, the two pleaded guilty in 1986 in federal court in Florida, admitting the fraud which constitutes the basis for this civil suit.[1] Over a hundred other persons besides Harrison were similarly defrauded, but Harrison's loss, the biggest of any of the defrauded investors, was found by the jury to be $3.4 million, to which the court added an additional $3.1 million prejudgment interest.

Kenning explained his view of how their successful fraud worked, for awhile. Kenning told his victims that because of his position as vice president at Dean Witter, and Carpenter's as salesperson, they were allowed to buy municipal bonds at advantageous prices through a special municipal bond investment program offered by Dean Witter for its large brokers. It was claimed by Kenning and Carpenter that the municipal bonds which could be bought through them were very good investments. When originally issued, he explained, the bonds had been discounted. Furthermore, when the municipal bonds would later be called, sometimes at a premium, it would be on a tax-free basis. Kenning further testified that he led Harrison to believe that he was able to take down large blocks of municipal bonds which he could share with Harrison because of his high production for Dean Witter, his general stockbroker ability, and because of his position as vice president.

Carpenter's account at Dean Witter though not also in Kenning's name played a part in their fraudulent activities. Kenning and Carpenter were investing their clients' money through this account, which they labelled a "trading account," but not in municipal bonds as they pretended. Instead, they were investing in riskier "put" options for themselves. They hoped to achieve greater returns through these personal riskier option investments. That might permit them, as they saw it, to keep both themselves and their special clients happy. As evidence of their clients' ostensible municipal bond investments, their special clients, including Harrison, were given promissory notes signed first by Carpenter, but later also by Kenning. Those notes purportedly showed the high returns expected, in this instance by Harrison, with enticing annualized interest rates of approximately eighteen to sixty percent on short maturities.

Kenning pretended to be a big player in the bond market and to be making his income from their nonexistent municipal bond transactions. Harrison testified that he was given to understand that he could not receive the benefits of these special municipal bond deals offered by Kenning and Carpenter if he opened his own personal account with Dean Witter. He understood from Kenning that Dean Witter had a special program for their large brokers, which Kenning and Carpenter claimed to be, allowing these top Dean Witter producers to profit by buying certain municipal bonds on the bid side of the market. If the blocks of municipal bonds available under this special arrangement were

---

1. Kenning received two consecutive four-year sentences and Carpenter a single four-year sentence.

bigger than Kenning and Carpenter could handle themselves, they explained to Harrison, then they would share these municipal bond investment opportunities with their special customers. According to Kenning and Carpenter, they were able to discount their usual commissions and to avoid the usual markup of Dean Witter, all for their own and their clients' benefit. Their special clients were instructed, however, that because of these special circumstances not available to Dean Witter's lesser producing brokers and their clients, they were to do business only with Kenning and Carpenter personally, not with Dean Witter directly.

Only a little of the income enjoyed by Kenning and Carpenter came from the commissions they occasionally generated for themselves on their own risky option investments or from their regular clients. Their Dean Witter trading account was in Carpenter's name only, but they considered it to belong to them both. There was evidence that the activity generated in their personal trading account was much higher than the industry average for employees of stock brokerage firms.

Carpenter appears to have spent most of his time looking after his and Kenning's personal option investments. Indeed, during his tenure at Dean Witter, Carpenter opened no more than five accounts for any of his other customers. Consequently Carpenter earned a minimum of commissions for almost three years, which the evidence suggested did not exceed $71,000. Yet Kenning and Carpenter paid into Dean Witter through their option investing in the trading account a little under two million dollars. Dean Witter allegedly profited from commissions on that activity in excess of $400,000.

Richard Frost, who had hired Kenning and Carpenter, was Dean Witter's Boca Raton branch manager with oversight responsibilities. He routinely received each month the statements of Carpenter's Dean Witter trading account. Dean Witter's rules required that these statements be reviewed by management. Carpenter's trading account statements revealed the unusually high amount of account activity, specifying the gains and losses. The account statements also showed Kenning and Carpenter often trading at the limit through that account. The energetic activity in the trading account, however, generated profits for Dean Witter. Dean Witter recognized those profits with letters of commendation to Kenning and Carpenter and even gave them a plaque in acknowledgement of their outstanding broker accomplishments. Periodically compliance officers of Dean Witter visited the branch office and among other accounts reviewed their trading account. Neither Kenning nor Carpenter, however, had any recollection of ever having been asked by a Dean Witter compliance officer about the very substantial losses they often sustained in their risky option investments, whether those losses could be handled by the two of them, and particularly where all the money was coming from for their trading account. If they were asked any pertinent questions, however, their answers appear to have been accepted without further investigation by Dean Witter.

Around the time Harrison got involved in the fraud, Carpenter had already paid Dean Witter about $800,000 to cover their net losses in the trading account. At one time Carpenter gave Dean Witter bad personal checks from his own personal bank account totalling over $100,000, supposedly to cover the substantial losses exceeding $300,000 in the Dean Witter trading account. Kenning and Carpenter had a good explanation to cover their NSF check problem, blaming it on the timing of their deposits, bad checks to them, and their withdrawals at the bank—a bookkeeping matter. Dean Witter then took steps, however, to protect itself from similar NSF checks. There was, nevertheless, Kenning explained, continual pressure from Frost to keep generating those profitable commissions for Dean Witter.

Harrison never opened an individual account at Dean Witter, nor did he ever receive a Dean Witter statement, nor did he have any correspondence with any Dean Witter personnel other than Kenning and Carpenter. Meanwhile Dean Witter had comprehensive and specific internal rules governing the business operations and the conduct of its employees. Frost and the compliance officers had the duty to enforce the rules.

Those rules specifically prohibited employees from engaging, as here, in securities transactions outside the usual course of business of the firm. To prevent rule violations, for instance, incoming office mail was opened and any checks enclosed were taken out in the cashier's office. Harrison, however, sent his investment funds to Carpenter's home or to Carpenter's personal bank account. The promissory notes Harrison received from Kenning and Carpenter bore no reference to Dean Witter. When from time to time Harrison received some return on his supposed bond investments, it was by a personal check of Carpenter, or in cash given to him by Kenning or Carpenter and delivered somewhere other than in Dean Witter's office. Carpenter supplied Harrison with IRS Form 1099s which identified Carpenter, not Dean Witter, as the source of the income.[2] Harrison sometimes had contact with Kenning and Carpenter's secretaries at Dean Witter, who identified the called number as "Dean Witter." The evidence shows Harrison telephoned Kenning and Carpenter as many as forty to fifty times at their Dean Witter offices. On one occasion Harrison was shown the Dean Witter office.

Kenning testified that in their big activity days Carpenter did not even have a net worth. Carpenter was facing bankruptcy. Much of their clients' money and any profits Kenning and Carpenter occasionally managed to make for themselves all evaporated in their risky personal investments and expenses, including (in addition to their option investments) a horse farm, private start-up companies, other personal expenditures, and, of course, their Ponzi scheme repayments which kept their fraud on life support.[3] About forty percent of all cash Kenning and Carpenter received was being recirculated through their Ponzi scheme. Their investments, unfortunately, were all losers. There is no allegation by Harrison or anyone else that Dean Witter had actual knowledge of this scam. This Kenning–Carpenter Ponzi scheme, however, lasted over thirty months in and around the branch office without being detected by Dean Witter.

Finally, and not surprisingly, this whole phantom securities operation collapsed around Kenning and Carpenter. They resigned from Dean Witter. It is not necessary to set forth here all the details of their fraudulent scheme which the jury heard, some of which could be deemed favorable to Dean Witter, and some not. The jury heard not only from Kenning, but also from Carpenter, Harrison, Frost, various personnel from Dean Witter, outside experts, and others. After weighing that evidence the jury resolved whatever evidentiary and credibility conflicts there may have been and found for Harrison under the jury instructions given by the trial court. Those instructions have not been made an issue in this appeal. We have reviewed the total trial transcript of this difficult trial. It was carefully handled by Judge Marovich as best the prior mandate of this court could be understood and applied.

The fraud as a factual matter is not disputed. Rather, the dispute is whether the evidence was sufficient to show Dean Witter liable under the Act, and whether the trial was fair as it relates to the exclusion of some of the tax evidence. Now it becomes our problem again.

## ANALYSIS

Our appellate standards of review are well recognized. In *Scaggs v. Consolidated Rail Corp.*, 6 F.3d 1290 (7th Cir.1993), Judge Bauer explained the relevant standards:

A motion to set aside the verdict is made pursuant to Federal Rule of Civil Procedure 50(b). We review a Rule 50(b) motion *de novo*, considering the evidence in the light most favorable to the prevailing party and drawing all reasonable inferences in favor of the prevailing party. If the evidence overwhelmingly favors the

---

2. The income tax aspects of these transactions will be considered in more detail in the discussion of the third evidentiary issue raised by Dean Witter, *infra*.

3. A "Ponzi" or "pyramid" scheme is one in which funds obtained from new investors are used to satisfy interest and principal obligations due on earlier investors' notes (and usually to line the pockets of the scheme's perpetrators). Such a scheme requires an ever-larger circle of new investors to keep it afloat, and thus almost invariably ends in disaster.

moving party, then the verdict cannot stand. [Citation omitted.] A motion for a new trial is made pursuant to Federal Rule of Civil Procedure 59(a). When reviewing a Rule 59(a) motion, we defer to the district court and reverse only if it has abused its discretion. In doing so, we determine whether the clear weight of the evidence is against the jury verdict, the damages are excessive, or for some other reason the trial was not fair to the moving party. [Citation omitted.]

6 F.3d at 1293.

### A. Control Person Liability

■ The judge based his instructions to the jury on the applicable sections of the Act and the Securities and Exchange Commission's Rule 10b–5.[4] The statute and rule, he explained, make it unlawful for anyone to commit a fraud in connection with the sale of a security. His instructions, in understandable language, gave the jury the law as we understand it to be and generally as expressed in our first opinion.

As we pointed out in *Harrison I*, 974 F.2d at 880, we have never used any test similar to the culpable participant test, as the district court had done in that case, "to so stingily limit the definition of control person." *Id.* That test originated with a 1978 case from the Ninth Circuit, and has since

been repudiated.[5] The SEC's definition of control "counsel[s] broad remedial construction of the statute and recognition of a practical ability to direct the actions of those involved." *Id.* at 878. We have long recognized that some indirect means of discipline or influence, although short of actual direction, is sufficient to hold a "control person" liable. *Id.* at 880. We stated our view this way:

> We have looked to whether the alleged control-person actually participated in, that is, exercised control over, the operations of the person in general and, then, to whether the alleged control-person possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised.

*Id.* at 881.

■ This interpretation does not make the broker-dealer an insurer of its registered representatives as Dean Witter claims. Section 20(a) of the Act, to the contrary, provides the alleged controlling person with an affirmative defense which, of course, that person has the burden of proving. Control person liability is foreclosed if the controlling person "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation." *Id.*

---

4. SEC Rule 10b–5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
　(a) To employ any device, scheme, or artifice to defraud,　.
　(b) *To make any untrue statement of a material fact* or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
　(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
Section 20(a) of the 1934 Act establishes liability as follows:
　Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation

thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.
15 U.S.C. § 78t.
　The definition of "control" promulgated by the Securities and Exchange Commission is:
　The term "control" (including the terms "controlling," "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.
17 C.F.R. § 240.12b–2 (1995).

5. *See Christoffel v. E.F. Hutton & Co.*, 588 F.2d 665 (9th Cir.1978), *overruled by Hollinger v. Titan Capital Corp.*, 914 F.2d 1564 (9th Cir.1990) (en banc), *cert. denied*, 499 U.S. 976, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991).

At trial, the district court instructed the jury among other things that Dean Witter could not be found liable merely because Kenning and Carpenter were its employees. The court explained that if control was found, Dean Witter could still escape liability if it established its good faith by showing it maintained a reasonable system of supervision, enforced that system with reasonable diligence, and that Dean Witter did not directly or indirectly induce the violations by Kenning and Carpenter. Because of this good faith defense and the scienter element required for the underlying 10b–5 fraud claims,[6] it was further explained that Dean Witter could not be liable in these circumstances for its mere negligence, but only if it acted recklessly. Recklessness was explained as conduct highly unreasonable, involving "not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, which presents a danger of fraud which is better known to the actor in this case, Dean Witter, or is so obvious that [Dean Witter] must have been aware of it." Applying those instructions and others, the jury found against Dean Witter.

Dean Witter's main contention on appeal regards the sufficiency of the evidence for the second element of the test for control liability, i.e., whether Dean Witter possessed the power or ability to control the specific predicate transaction, in view of its good faith defense. We first discuss the control issue, and explain our finding regarding the appropriate "specific predicate transaction" in part B, *infra*.

Dean Witter points to its comprehensive in-house rules, its compliance officers, the supervision exercised by its branch office manager, and the nature of the particular promissory note transactions as preventing or excusing control person liability. There is sufficient basis in the record, however, for a reasonable jury to conclude that even within a sophisticated, well-known, and reputable company such as Dean Witter, at least in this one instance, there was a total lack of suffi-

cient diligence, that the supervision was only very casual or grossly indifferent, and that Dean Witter totally ignored the obvious warning signs. In view of the high monetary stakes and the risks resulting from sophisticated and contriving minds, mere reliance on published rules and indifferent or superficial supervision of Kenning and Carpenter's activities while providing income for Dean Witter could be viewed by a jury as reckless under the instructions.

There was also sufficient evidence for a reasonable jury to determine that had Dean Witter not shut its eyes to the various fraud signs available to it, as it did, then the whole scheme could have been detected and shut down by Dean Witter far earlier than when it collapsed. Furthermore, Dean Witter's explanations for a possible lack of diligence and its good faith efforts in enforcing its compliance systems was also before the jury. Dean Witter's Boca Raton branch manager, Richard Frost, testified that Dean Witter ran each branch office as an independent center. The profitability of the branch office, and the gross commissions from the registered agents in that branch, were factors in his own personal Dean Witter compensation. The more profitable the office, the greater was Frost's personal compensation. The ignored aggressive trading of Kenning and Carpenter in their trading account thus helped generate gross commissions benefiting Frost personally as well as Dean Witter. Frost testified he was aware that most of Kenning's commissions were generated in his and Carpenter's trading account, and not from commissions in their other customers' accounts. As Frost candidly said they were paying with "good money" so there was no reason for him to disbelieve Kenning and Carpenter. The problem was that though it was "good money" it belonged to somebody else and not to them.

This small portion from the deposition of Frost, here under cross-examination, serves as a sample to illustrate the total indifference of his management:

---

**6.** *See Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 209 n. 28, 96 S.Ct. 1375, 1388 n. 28, 47 L.Ed.2d 668 (1976).

Q. Did you discuss with John Carpenter where he was getting $98,000?

A. No.

Q. Did you discuss with John Carpenter where he was getting $25,000 to deposit in the account?

A. No.

Q. Did you discuss with John Carpenter how it came about that $50,000 check (sic) bounced in his account?

A. Yes. It says someone wrote him a check. Wrote him a check bounced to him.

Q. Did he tell you who bounced the $50,-000 check to him?

A. No.

Q. Did you ask him what kind of business he was in or what relationship he had with someone who was bouncing a $50,000 check to him?

A. I don't remember.

Q. Did you become suspicious in April 1984 about any outside activities of John Carpenter?

A. No.

Q. Did you think it was ordinary and customary for an account executive to be passing or receiving $50,000 checks away from his employment?

A. Don't remember.

Q. Were there ever any other instances where you learned that checks in the tens of thousands of dollars were being bounced in John Carpenter's account?

A. I don't remember.

Dean Witter could be seen by the jury to have been influenced in its "look the other way supervision" by the commissions being generated by Kenning and Carpenter's risky options trading. In fact, as noted above, Dean Witter commended Kenning and Carpenter for their commission-generating activity, and at times even pressed for more of it. Just where all the money being invested by Kenning and Carpenter was coming from, whether it could possibly be within their own means, or whether the substantial losses Kenning and Carpenter were incurring could be covered by them, was not inquired about, or at most done so superficially without any investigation or follow-up. In any case this transparent or at least extremely suspicious situation surrounding Kenning and Carpenter's activities at Dean Witter was largely ignored.

The rather unusual combination of record setting activity in Kenning and Carpenter's own options account, sometimes to the limit and with substantial losses, while at the same time opening very few accounts for any other customers appears not to have been of significant concern to other Dean Witter personnel. Dean Witter's Deputy Director of Compliance agreed in his testimony that Carpenter's trading account showed aggressive trading. One of Dean Witter's internal rules includes a review of employees' accounts to be sure that type of trading is not excessive and conforms to the employees' financial circumstances. That compliance officer, however, could not recall that Carpenter, the most aggressive trader in that branch office, had ever been discussed. In fact the compliance officer knew little about Kenning and Carpenter. Another Dean Witter compliance officer testified that he had never seen option trading activity as great as that in Carpenter's account. These obvious warning signs, though noticed by Dean Witter compliance personnel, were totally ignored.

It was a violation of Dean Witter's rules for their registered representatives to use their individual Dean Witter personal accounts for their clients, as well as to do aggressive trading in their own accounts. Still, Kenning and Carpenter in effect ran their own fraudulent broker-dealer operation within Dean Witter for over thirty months without being detected. Considering all these facts and circumstances, a jury could reasonably have concluded under the instructions that more was required from a legitimate broker-dealer to protect itself from such employees and their possible fraudulent schemes. The amount of securities fraud litigation appearing in the courts, though fortunately the exception in the securities business, should be at least sufficient to encourage a continuous high standard of caution by broker-dealers to protect themselves and their clients from the machinations of their own unscrupulous employees. Dean Witter

concedes the Kenning-Carpenter scheme eluded all their controls, but the jury believed it should not have, at least for the long period of time which it did.

Dean Witter further argues there is no way to control mail to an agent's home, or what its employees do in their own personal bank accounts away from Dean Witter, or what occurs when its employees meet a customer away from the office and transact their business in cash. That is true regarding isolated circumstances, but Dean Witter cannot totally ignore repeated warning signs that there were clandestine and irregular activities being conducted by its representatives within and around its organization.

Dean Witter also argues that Harrison's big investments show little correlation with the sums actually going into Kenning and Carpenter's options account. Not all of the money of the special investors went into that trading account; some of it went into the horse farm and elsewhere, but there is a sufficient correlation and relationship to strongly suggest that Kenning and Carpenter's excessive options speculations could not have been supported by their own limited means. It was obviously the money of others, in this instance Harrison's, that was being used and lost in the Dean Witter trading account. All these arguments of Dean Witter have some appeal, but are unavailing in the context of all the evidence considered by the jury.

Viewing the evidence in the light most favorable to the prevailing party, as we must, we cannot conclude that the evidence "overwhelmingly favors" Dean Witter in terms of control person liability, and thus conclude that Dean Witter was not entitled to prevail on its motion for judgment as a matter of law.

### B. Justifiable Reliance with Respect to the Underlying Primary Securities Fraud Section 10(b) Claim

Dean Witter also claims that it is entitled to a new trial because there was legally insufficient evidence to enable a jury to find the justifiable reliance necessary for a Section 10(b) violation. It also claims that the promissory notes themselves are proper-

ly regarded as the specific predicate transaction against which this reliance should be judged. As stated above, we review the district court's rulings under an abuse of discretion standard, and determine whether the clear weight of the evidence is against the jury verdict, jury instructions not being an issue.

As a preliminary matter, Dean Witter argues that our comment in *Harrison I* that no reasonable person could "naturally suppose that Kenning and Carpenter possessed the authority to use the employee account for Harrison's benefit," 974 F.2d at 884, is dispositive regarding the issue of reliance as an element of the predicate 10(b) violation under the Act. That prior comment was made only in the summary judgment context regarding the state law agency issue of *respondeat superior* liability, and not regarding the control provisions of the Act. Some of the same considerations may also apply in a *respondeat superior* state claim context, but reliance under the Act involves other considerations as well. We explicitly remanded the control issue back to the district court for the fact finder to determine the main statutory question of control person liability. That liability among other things requires a predicate securities violation. We also stated that:

> The alleged facts are sufficient to prevent our finding, as a matter of law, either that Dean Witter did not actually exercise control over the operations of Kenning and Carpenter in general or that Dean Witter did not possess the power or ability to control Kenning and Carpenter's transactions upon which the primary violation is predicated.

The issue of justifiable reliance under the Act in these particular circumstances was properly presented to and determined by the fact finder.

The trial court instructed the jury that to satisfy the justifiable reliance claim, Harrison must prove that he in fact relied upon false statements, and that he would not have engaged in the transactions in the absence of those statements. The jury was also instructed that Harrison must prove that this reliance was justified; that is, he could not

have intentionally closed his eyes and refused to investigate circumstances in disregard of known or obvious risks. No objections were offered to these instructions, and we see none. The jury under these instructions found for Harrison.

We find sufficient evidence to support that verdict. Dean Witter asserts that the promissory notes Kenning and Carpenter gave to their special customers, unadorned with Dean Witter's name, could not serve as the basis for the required reliance. Dean Witter has focused its arguments on the promissory notes as if they were totally unrelated to the other parts of the fraud. Yet the promissory notes do not merely by themselves form the predicate securities violations here involved. Those notes can be viewed as little more than confirmations of the pretended municipal bond investments, or just lulling receipts for the money supposedly being invested for the victims in municipal bonds through the Dean Witter trading account. The notes, however classified, were nevertheless a part of Kenning and Carpenter's whole fraudulent scheme. That one fraudulent scheme cannot now be divided into its separate parts and then each part judged independently; neither would a victim of such a scheme reasonably believe he was investing only in personal promissory notes and not in municipal bonds with their tax benefits.

The security transactions at issue were the supposed purchase of municipal bonds through the Dean Witter trading account, not the promissory notes which ordinarily do not need to be acquired through a broker. The return Harrison was expecting to receive was from the municipal bonds, not the promissory notes. In Judge Marovich's opinion he concisely summed up the situation. He wrote: "Essentially, Kenning and Carpenter made the investment seem like a program that retained the relative safety and tax benefits of municipal bonds but offered a higher rate of return for the select group of individuals chosen by Kenning and Carpenter to receive this special benefit available only through them." The district judge further added that the evidence was "sufficient for a reasonable jury to find that Kenning and Carpenter, through persuasion, guile, de-

ception and misdirection, lulled Harrison and over a hundred other investors into a false sense of security." Given this overall situation, the jury could have reasonably believed that the false representations involved in the total fraud scheme were relied on by Harrison as true. The causal connections between the aspects of this fraudulent scheme are enough to support a finding of reliance. *See Flamm v. Eberstadt,* 814 F.2d 1169, 1173 (7th Cir.), *cert. denied,* 484 U.S. 853, 108 S.Ct. 157, 98 L.Ed.2d 112 (1987).

The fact of reliance in this case, however, is not enough by itself; that reliance must be justifiable, or reasonable. *See Teamsters Local 282 Pension Trust Fund v. Angelos,* 762 F.2d 522, 530 (7th Cir.1985). The jury was instructed as to this requirement, and found that it was met. Considering the fraud as a whole, we believe that here there was sufficient evidence to support that verdict. Kenning and Carpenter used their positions at Dean Witter, their trading account, and other indicia of their positions at the firm (such as office facilities, printouts from databases, and calling cards, etc.) to help operate their scheme. Kenning testified that he used his position at Dean Witter to make his victims feel comfortable about doing business with them. The jury was also instructed that the assumption of any known risk by Harrison, or any reckless risk-taking by Harrison, would necessarily negate a finding of reliance as that circumstance would be in the nature of an independent intervening cause. Dean Witter also offered its *in pari delicto* affirmative defense on which the jury was instructed, but that defense was rejected.

We do not believe the clear weight of all the evidence is sufficient to vacate the jury's verdict although there was evidence on both sides of the issue. The fact finder was properly instructed, and we will not disturb its verdict.

### C. The Exclusion of Income Tax–Related Evidence

■ Finally, Dean Witter argues that the district court erred in excluding certain tax form evidence that it contends would have supported its theory that no justifiable reliance existed. The evidence that was exclud-

ed and would have made the difference, according to Dean Witter, was the claim that Harrison knowingly accepted from Kenning and Carpenter incorrect IRS Form 1099s as well as dual sets of promissory notes. One set of these notes, it is alleged, stated the actual promised rate of return, but the other stated a lower rate of return to be used for income tax purposes.

Harrison disputed those facts alleged by Dean Witter. There were thirty-two promissory notes issued, whether characterized as confirmations or receipts or otherwise. As far as we can tell from the record, and as Harrison claims, only two of the thirty-two promissory notes were actually dual sets. On one dual set there was a difference in the supposed rate of return; one showed the rate at 7½ percent and the other at 9¼ percent, less than a 2 percent difference. One of the notes in the other dual set indicated on its face that it was merely a duplicate.

The IRS Form 1099 is a yearly form designed to show income to a taxpayer from an identified source; it is to be used for the recipient's income tax purposes. Dean Witter points out that the Form 1099 received by Harrison for 1985 showed less than what Harrison actually received in 1985 from Kenning and Carpenter. This was done, Dean Witter says, at Harrison's direction. Dean Witter labels the payments from Carpenter to Harrison as cash interest payments to be included in his return.

The district court allowed the Form 1099 into evidence which showed that Carpenter, not Dean Witter, was the payor. Harrison used that form to report his interest income for 1985. Dean Witter was then allowed to show and argue those facts pointing out that Dean Witter was not involved with any of the reported income or the Form 1099. The district court did not allow Dean Witter, however, to attempt to show that Harrison should actually have reported more income, or that Harrison knew he should have reported more income. That he allegedly did not correctly report his income to this extent, Dean Witter argues, shows that Harrison himself was culpable, and this inference might have led the jury to conclude otherwise on the issue of reliance.

In fact it cannot be certain that any interest income was paid to Harrison even if Harrison may have thought he was earning interest from the promissory notes. In his deposition, Kenning testified as he saw it how some of the investors fared. Kenning and Carpenter would at times pay, when they had to, what they called "interest" to an investor who had already but unknowingly lost the principal of his investment. In classic Ponzi-scheme fashion, when an investor wanted a return on his investment, that particular impatient investor would be paid "interest" out of the money paid in by other investors. There was also a variation. As it was explained by Carpenter, sometimes those "interest" payments were often no more than "the investors' own money going back in. In other words, they would send us a check a week before our monies were due and we'd be—let the accountant send it back out to them."

In this situation, the district judge rightly declined to begin a tax evasion trial within the midst of the securities fraud case. The difficulty of that tax exploration would be compounded by the particular facts of this fraud. It could be that there was no taxable interest paid, only Ponzi payments to keep things from exploding. Perhaps some of it was interest. On the other hand, there could also be the question of what Harrison may have considered the payments to be, i.e., his own intent. The district court understandably concluded that if there was some activity that might amount to tax cheating, the IRS would have to figure that out, not the jury in this securities case.

Dean Witter sought to open up these tax matters before the jury for the purpose of showing that Harrison's knowledge precluded a finding of justifiable reliance. That effort, in these factual circumstances, would not only have prolonged the trial and confused the jury and possibly everybody else involved as well, but could not have added justifiable reliance evidence to the extent Dean Witter claims. The issue would have been further complicated by the fact that Harrison thought he was investing in municipal bonds which would provide tax-free income. Any theoretical interest income which

was underreported by Harrison due to the fraud of Kenning and Carpenter would have been of dubious value to Dean Witter in view of the other evidence introduced separating Dean Witter from the notes and the Form 1099s.

We believe the trial judge was justified in concluding under Fed.R.Evid. 403 that this tax evidence was excludable even if relevant, on the ground that its probative value was substantially outweighed by prejudice to Harrison, confusion of the jury, and a waste of time. This, in effect, is what he did. The possible tax issue is sufficiently separate from the investment fraud so as not to be unnecessarily entangled in the same trial. Moreover, there was the other evidence of Harrison's possible complicity or awareness which might have supported a finding of a *lack* of justifiable reliance. The questionable things concerning Harrison's own conduct as would have possibly impacted on jury issues were not excluded. The 1099 tax form issue was presented to the jury by Dean Witter to show that the money Harrison received came from Carpenter, not Dean Witter. Before the jury, Dean Witter also questioned why Harrison's tax returns reported a substantial sum as interest received when municipal bond interest is not taxable. In the same final argument, however, it was candidly conceded by Dean Witter that Frost, its branch manager, was "not perfect." In sum, we do not agree that the additional uncertain tax evidence could have sufficiently helped Dean Witter prevail before the jury on the issues arising under the Act. Thus we do not believe that in these difficult circumstances the trial judge can be faulted for the way in which he exercised his evidentiary discretion. The verdict of the jury sorting out the evidence under the instructions must stand.

## CONCLUSION

The case is therefore AFFIRMED in all respects.