**In the Matter of LAKE STATES COMMODITIES, INC., Consolidated Pretrial Proceeding.**

No. 96 C 0587.

United States District Court,
N.D. Illinois,
Eastern Division.

July 24, 1996.

Arthur W. Aufmann, Edward T Joyce & Assoc., Chicago, Illinois.

John S. Bishof, Chicago, IL.

Francis J. Marasa, Sweeney and Riman, Chicago, IL.

Richard B. Polony, Hinshaw & Culbertson, Chicago, IL.

David J. Philipps, Beeler, Schad & Diamond, Chicago, Illinois.

James P. Fitzgerald, James G. Powers, McGrath, North, Mullin & Kratz, Omaha, NE.

Charles M. Thompson, Querry & Harrow, Chicago, IL.

Ira N. Helfgot, Chicago, IL.

## MEMORANDUM OPINION AND ORDER

ASPEN, Chief Judge:

The plaintiffs in these consolidated actions are a group of investors who allegedly lost large sums of money entrusted to Thomas Collins and Lake States Commodities. On January 25, 1996, we accepted reassignment of eleven of these actions in order to coordinate pretrial discovery and consider the merits of a single motion to dismiss that raised issues common to all the actions. Presently before us is Geldermann's motion to dismiss all counts against it. For the reasons set forth below, the motion is granted in part and denied in part, and the parties are directed to appear for a status hearing on August 9, 1996.

### I. Background

To better understand the plaintiffs' claims, we begin with a brief sketch of the regulatory structure of the commodity futures market in America, and its two regulatory organizations: the Commodity Futures Trading Commission ("CFTC") and the National Futures Association ("NFA"). The CFTC is the federal agency entrusted with protecting the integrity and security of the commodities markets through the enforcement of the Commodities Exchange Act and its related rules and regulations. Although the CFTC does not place stringent requirements on those who trade their own funds in the market, the Commission does require anyone who handles customer funds for the purpose of trading in the commodity futures market to register with the NFA, the self-regulating body of the commodity futures market. Compl. ¶¶ 2–3.[1] Thus, anyone who accepts orders, money, or securities for the purpose of effectuating a purchase or sale of a commodity futures contract must register as a futures commission merchant ("FCM"). Similarly, anyone who operates a "commodity pool" of third-party funds in order to buy and sell commodity futures contracts is required to register with the NFA as a commodity pool operator ("CPO"). Direct participation in trading is not required to fall under the purview of the CFTC: those who advise others for a fee about trading futures contracts must register as commodity trading advisors ("CTA"), and a person who solicits orders or customers on behalf of a FCM, CPO, or CTA must register as an associated person ("AP"). Compl. ¶¶ 4–8.

Beginning in 1984, Thomas Collins began soliciting customers to invest money into a commodity pool ("Collins pool") which was used to trade commodity futures. Compl. ¶ 20. However, Collins was not registered with the CFTC or the NFA, and consequently, could not legally solicit, accept, or pool customer funds, and was prohibited from trading such funds on the commodities market. Compl. ¶ 22. Collins nonetheless pooled such funds in an omnibus account[2] at Heinold Commodities ("Heinold"), and was permitted to trade them on the market. Compl ¶¶ 12, 23. He then began using Lake States Commodities (an Illinois corporation that he controlled) and its selling agents to assist him in soliciting funds, collecting money from investors, and issuing account statements relating to the Collins pool. Compl. ¶¶ 11, 21. All of this was illegal, Plaintiffs claim, because neither Collins nor any Lake States employees (named as individual defen-

---

1. The plaintiffs in all of these actions have filed second amended complaints which essentially track each other paragraph-by-paragraph. The only exceptions are those complaints containing malpractice claims against James B. Koch in Counts XII and XIII; however, none of these claims are the subject of the instant motion. Thus, for simplicity we will use "Compl. ¶ ——" to refer to the paragraphs of the second amended complaint filed by the plaintiffs in the original case assigned to this Court, *Apostolou v. Geldermann* (94 C 3876).

2. According to the complaint, a non-member broker opens an omnibus account with a clearing firm member of the exchange in order to hold other people's money for investment purposes. Compl. ¶ 23.

dants in this action) were registered with the CFTC or NFA, and none of the risks associated with the commodities markets were explained to the investors. Compl. ¶ 22. Nonetheless, through the use of Lake States Commodities and Heinold, Collins portrayed the Collins pool as a legitimate, profitable enterprise. Compl. ¶ 23.

In 1986, Geldermann purchased all of Heinold's stock, thereby acquiring the firm's trading records, employees, and accounts—including those accounts operated by Collins. Compl. ¶ 24. Collins eventually closed his omnibus account, and along with the individual defendants opened several joint trading accounts at Geldermann, although he failed to complete the necessary opening documentation for these joint accounts. Compl. ¶ 25. At some point, the plaintiffs claim, Collins and the defendants began to solicit new investors not only to bolster the credibility of the Collins pool, but also to pay off prior investors with the "profits" obtained from new investments. In other words, Collins and the individual defendants are alleged to have utilized the pool as a vehicle for a Ponzi scheme.[3] Compl. ¶¶ 26–27.

The plaintiffs contend that Geldermann, a registered FCM, received commissions on every trade Collins conducted, and thus had an incentive to perpetuate and assist his fraud. Compl. ¶ 41. They claim that Geldermann provided Collins with a desk and a phone at the Geldermann booth on the floor of the MidAmerica Commodity Exchange, thereby enhancing Collins' appearance of legitimacy. Compl. ¶ 30. Geldermann treated Collins' individual and joint accounts as one omnibus account, taking instructions to effect trades from Lake States employees not listed on the accounts. Compl. ¶ 31. Geldermann also permitted Collins to write his own orders on Geldermann order forms—a task which only Geldermann employees were authorized to perform. Compl. ¶ 31.

In August 1988, Geldermann's parent corporation, ConAgra, hired James Fuller as an audit supervisor. Fuller was aware that Collins had previously skirted various rules of the CFTC and NFA, and warned senior Geldermann officers of problems if they continued doing business with Collins. Fuller was allegedly told by these officers that Collins had plenty of money to trade, and that any potential rule violations would be ignored at that time. Compl. ¶ 32. Fuller continued his investigation of Collins and his commodity pool, and discovered that Geldermann was allowing Collins to improperly transfer trades and funds between accounts with different ownership, and to open joint accounts without proper documentation. Moreover, Fuller believed Geldermann was fostering the market's favorable image of Collins by allowing him to pool third-party funds in several joint accounts, and by providing him with a desk and phone on the exchange. When informed by Fuller of these problems, Geldermann's officers allegedly told their auditor to stop investigating Collins. Compl. ¶¶ 33–35.

The plaintiffs contend that in late 1989 Geldermann began taking a more active role in perpetrating the Lake States/Collins fraud. In October 1989, the CFTC began an investigation into Collins, and subpoenaed Geldermann's records regarding his trading accounts at the firm. The plaintiffs allege, however, that because Geldermann had improperly opened many joint accounts for Collins, Geldermann surreptitiously completed and back-dated much of the required documentation before providing it to the CFTC. Compl. ¶ 36. In addition, Geldermann's legal department began monitoring the CFTC investigation, and learned (1) that Collins had accepted large amounts of third-party funds

---

**3.** 1A "Ponzi scheme" is a type of fraud which requires an ever increasing stream of investors in order to fund obligations to the earlier investors, with a resulting pyramiding of the liabilities of the enterprise. The appellation is derived from one Charles Ponzi, a famous Boston swindler. With a capital of $150, Ponzi began to borrow money on his own promissory notes at a 50% rate of interest payable in 90 days. Ponzi collected nearly $10 million in 8 months beginning in 1919, using the funds of new investors to pay off those whose notes had come due. A more complete account of Ponzi's exploits can be found in *Cunningham v. Brown*, 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924).

*United States v. Shelton*, 669 F.2d 446, 449 n. 2 (7th Cir.), *cert. denied*, 456 U.S. 934, 102 S.Ct. 1989, 72 L.Ed.2d 454 (1982).

to trade commodity futures without registering with the CFTC or NFA, (2) that Geldermann checks issued to Collins had been endorsed over to third-parties, (3) that Lake States had issued phoney trading account statements from Heinold—after Geldermann had purchased the company—indicating greatly inflated account balances, (4) that Lake States was operating a customer commodities business out of its offices, and (5) that the individual defendants—selling agents for Collins and Lake States—had asserted their Fifth Amendment privilege against self incrimination during depositions taken by the CFTC. Compl. ¶¶ 37–45.[4] The plaintiffs maintain that despite all this information, Geldermann's officers still refused to close down Collins and Lake States, allegedly because his trading accounted for a large portion of Geldermann's business. Compl. ¶¶ 41, 46.

The plaintiffs claim they made most of their investments with Collins after May 1990, when Geldermann was aware of his fraudulent and illegal activities, and that they gave Collins their money because of the appearance of legitimacy and profitability fostered by Geldermann and the individual defendants. Compl. ¶¶ 47–48. They allege that the Ponzi scheme collapsed in June 1994 and Collins absconded with their stakes.[5] Various investors filed these lawsuits against the individual defendants and Geldermann,[6] bringing claims under the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 6d, 6b, 6o, 13(a), the Securities Act of 1933 ("1933 Act"), 15 U.S.C. §§ 77l(2), 77o, the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. §§ 78j(b), 78t(a), Securities and Exchange Commission Rule 10b–5 ("Rule 10b–5"), 17 C.F.R. § 240.10b–5, the Racketeer Influenced and Corrupt Organizations Act

("RICO"), 18 U.S.C. § 1962(c), the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1–505/12, and common law fraud. Geldermann now moves under Federal Rules of Civil Procedure 12(b)(6) and 9(b) to dismiss all claims against it.

## II. Motion to Dismiss Standard

Dismissal under Rule 12(b)(6) shall be granted only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Chaney v. Suburban Bus Div. of the Regional Transp. Auth.,* 52 F.3d 623, 627 (7th Cir. 1995). While at this stage in the proceedings we accept as true all well pleaded allegations in the complaint and any reasonable inferences that may be drawn from them, "[a] complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)." *Palda v. General Dynamics Corp.,* 47 F.3d 872, 874–75 (7th Cir.1995).

## III. Discussion

### A. Aiding and Abetting Under the CEA (Counts II–IV)

In Counts II, III, and IV, the plaintiffs seek to hold Geldermann liable for Collins' violations of § 4b, § 4o, and § 4d of the CEA.[7] In pertinent part, § 22 of the CEA provides:

> Any person ... who violates this chapter or who willfully aids, abets, counsels, induces, or procures the commission of a violation of this chapter shall be liable for actual damages resulting from one or more of the transactions referred to in subpara-

---

**4.** Geldermann allegedly became aware of some of this information through reading *Collins v. C.F.T.C.,* 737 F.Supp. 1467 (N.D.Ill.1990), an opinion denying motions brought by Collins and the individual defendants in this action to quash CFTC subpoenas. Compl. ¶ 38–39.

**5.** We note that Collins was apparently located this past week in San Diego, California, but committed suicide just before being arrested for bank robbery. John O'Brien & Dionee Searcey, *Suicide Ends High–Roller's Fugitive Life,* Chi. Trib., July 24, 1996, at 1, 10.

**6.** Collins and Lake States were originally named as defendants in some actions, but have been dismissed because of involuntary bankruptcy petitions filed against them. Compl. ¶¶ 11–12.

**7.** In the text we shall refer to various provisions of the CEA by their section numbers in the Public Laws. However, in citations we will refer to their codified sections within Title 7 of the United States Code.

graphs (A) through (D) of this paragraph and caused by such violation to any other person ...

....

(C) who purchased from or sold to *such person* or placed through *such person* an order for the purchase or sale of ... (iii) an interest or participation in a commodity pool....

7 U.S.C. § 25(a)(1) (emphasis added). Section § 22(a)(2) states that, except under certain circumstances not relevant here, "the rights of action authorized by this subsection ... shall be the exclusive remedies under this chapter available to any person who sustains loss as a result of any alleged violation of this chapter." 7 U.S.C. § 25(a)(2). Thus, under the plain language of these provisions, a plaintiff must demonstrate that a defendant is one of the "such persons" listed in § 22(a)(1)(A)–(D) in order to hold that defendant liable under the CEA. *Damato v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 878 F.Supp. 1156, 1161 (N.D.Ill.1995); *Vildaver v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 94 C 3041, 1995 WL 106396, at *4 (N.D.Ill. March 9, 1995); *Davis v. Coopers & Lybrand*, 787 F.Supp. 787, 794 (N.D.Ill.1992); *Grossman v. Citrus Assocs. of the N.Y. Cotton Exch.*, 706 F.Supp. 221, 230–31 (S.D.N.Y.1989). Applying these provisions to the instant case leads to the conclusion that unless Geldermann sold interests in the Collins pool to the plaintiffs, or accepted orders for such purchases, no cause of action under the CEA will lie against this defendant.

■ Plaintiffs concede that no such allegation against Geldermann is made in their complaints. Instead, they argue that despite the clear language of the statute, Geldermann may still be held liable under the CEA because it "aided and abetted" Collins in the commission of his fraud. In support, the plaintiffs point to § 13(a) of the CEA, which provides that "[a]ny person who commits, or who willfully aids, abets, counsels, induces, or procures the commission of, a violation of the provisions of this chapter ... may be held responsible for such violation as a principal." 7 U.S.C. § 13c(a). One court in this district has accepted this argument, and permitted CEA claims against two defendants who were not alleged to fall under the "such persons" language of § 22(a)(1)(A)–(D). *In Re ContiCommodity Servs., Inc. Sec. Litig.*, 733 F.Supp. 1555, 1567 (N.D.Ill.1990). However, two other courts in this district have rejected the contention that private parties may proceed under § 13(a), reasoning that Congress expressly stated its intent to have § 22(a) constitute the sole private damage remedy under the CEA, and rejecting the notion that courts should nonetheless imply a private right of action under § 13(a) for aiding and abetting. *Damato*, 878 F.Supp. at 1161 n. 3; *Vildaver*, 1995 WL 106396, at *4 n. 3; *Davis*, 787 F.Supp. at 795 n. 15.

We are persuaded that this latter position is correct. Congress could not have more clearly pronounced its intention to create only one vehicle for private causes of action under the CEA, *see* 7 U.S.C. § 25(a)(2), and given recent Supreme Court teachings on statutory construction, we are loathe to imply a private right of action into § 13(a). *Cf. Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, ——–––––, 114 S.Ct. 1439, 1447–48, 128 L.Ed.2d 119 (1994) (refusing to imply private cause of action for aiding and abetting Rule 10b–5 violation) Rather, we read § 13(a) to empower the CFTC, the public agency entrusted with enforcing the CEA, to bring actions against aiders and abettors of § 22(a) violations. To be sure, § 13(a) was amended in 1983 to remove language that limited its applicability to administrative proceedings,[8] but we do not believe this alteration justifies construing the statute in such a way as to eviscerate the exclusivity proviso in § 22(a)(2). Rather, the better interpretation of this amendment is that it granted additional power to the CFTC to bring judicial, as well as administrative, proceedings

---

8. Previously, the relevant provision stated: "Any person who commits, or who willfully aids, abets, counsels, induces, or procures the commission of, a violation of the provisions of this chapter ... may be held responsible *in administrative proceedings under this chapter* for such violation as a principal." (emphasis added).

against those who aid and abet violations of § 22(a).[9]

Plaintiffs argue that aiding and abetting liability under § 13(a) should be inferred into the statute in the same manner as *respondeat superior* liability has been imputed to principals through § 2(a)(1) of the CEA.[10] *See Bosco v. Serhant*, 836 F.2d 271, 280 (7th Cir.1987) (recognizing *respondeat superior* liability), *cert. denied*, 486 U.S. 1056, 108 S.Ct. 2824, 100 L.Ed.2d 925 (1988). However, this contention is flawed for three reasons. First, *respondeat superior* is merely a means of imputing the liability of an agent to its principal; in contrast, the plaintiffs here ask us to recognize a private cause of action that reaches all those who merely aid or abet a CEA violator. Second, because principals act through their agents (sometimes exclusively), an agent's commission of the acts prohibited by § 22(a)(1)(A)–(D) may properly be imputed to the principal simply by virtue of the relationship between the two parties. Thus, it is not inconsistent with the language of the statute to hold a principal liable for the § 22(a) violations of its agent. Third, while imputing liability to principals may be accomplished by reading the *respondeat superior* provision of the statute in conjunction with § 22(a), no implied cause of action under § 13(a) is necessary to reach aiders and abettors under the CEA, since § 22(a)(1) already provides for the liability of aiders and abettors who also commit one of the acts listed in § 22(a)(1)(A)–(D). As discussed by the dis-

trict court in *Kolbeck v. LIT America, Inc.*, 923 F.Supp. 557, 568 (S.D.N.Y.1996):

> Section [22] contains its own aiding and abetting language that is both explicit, and, by its terms, exclusive.... Thus, not only is there no need to resort to the general aiding and abetting section, but such resort is explicitly barred. By contrast, § [22] contains no language imposing respondeat superior liability. Therefore, it is entirely permissible to rely on the general respondeat superior section of the statute, 7 U.S.C. § 4, as the basis for imposing such liability absent any reason to conclude that Congress did not intend for § [2] to apply to § [22]. There is no such reason.

In sum, we conclude that the language of the CEA is plain in its limitation on the private causes of action that may be brought: only those claims specified in § 22(a)(1) are cognizable. As the plaintiffs have failed to allege that Geldermann committed any of the acts proscribed in § 22(a)(1)(A)–(D), we must dismiss Counts II, III, and IV against that defendant.

## B. Violation of the NFA Agreement (Count V)

■ Geldermann next challenges Count V, which is premised on the defendant's breach of its obligations as a member of the NFA. Specifically, the plaintiffs argue that under NFA Bylaw 1101,[11] Geldermann was re-

---

9. None of the cases cited by the plaintiffs directly address the question of whether the post–1982 version of § 13(a) contains a private cause of action for aiding a CEA violation, or whether such an interpretation comports with § 22(a)(2). Rather, these cases simply assume the existence of such a cause of action in the course of either (1) holding that the amended statute does not apply retroactively to pre–1983 violations, *see Fleming v. Bank of Boston Corp.*, 127 F.R.D. 30, 37 (D.Mass.1989), *aff'd*, 922 F.2d 20 (1st Cir. 1990); *Bennett v. E.F. Hutton Co.*, 597 F.Supp. 1547, 1553 (N.D.Ohio 1984); *Johnson v. Chilcott*, 590 F.Supp. 204, 206–07 (D.Colo.1984), or (2) discussing the sufficiency of the allegations or evidence on the issue of scienter, *see Peltz v. SHB Commodities, Inc.*, No. 89 Civ. 2526 (JFK), 1996 WL 97178, at *15 (S.D.N.Y. March 5, 1996) (ruling for defendant after bench trial); *F.D.I.C. v. FSI Futures, Inc.*, No. 88 Civ. 906 (PNL), 1991 WL 224302, at *5 (S.D.N.Y. Oct. 16, 1991) (denying motion to dismiss). Consequently, we find

unpersuasive any suggestion in these cases that a private right of action exists under § 13(a).

10. For the purpose of this chapter the act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official, agent, or other person.
7 U.S.C. § 4.

11. No member may carry an account, accept an order or handle a transaction, in commodity futures contracts, for or on behalf of any non-Member of NFA ... that is required to be registered with the Commission as an FCM, Introducing Broker, Commodity Pool Operator, [or] Commodity Trading Advisor....
Pls.' Resp., Ex. C (quoting NFA Bylaw 1101).

quired to prevent its customers, such as Collins, from acting as unregistered FCM's, CPO's, or CTA's. In addition, the plaintiffs point to NFA's March 19, 1987 Interpretive Notice for Bylaw 1101,[12] which contains a nonexhaustive list of internal procedures that the organization recommends FCM's use in order to comply with Bylaw 1101. Based on the alleged violation of this Bylaw and Interpretive Notice, the plaintiffs believe they are entitled to bring a claim against Geldermann.

However, the Seventh Circuit has previously rejected the proposition that general rules of an exchange organization can be construed to create private rights of action. In *Indemnified Capital Invs., S.A. v. R.J. O'Brien & Assocs., Inc.*, 12 F.3d 1406, 1412 (7th Cir.1993), the Court of Appeals affirmed the dismissal of a breach of fiduciary duty claim based on NFA Compliance Rule 2–4, which obligated members of the association to "observe high standards of commercial honor and just and equitable principles of trade." Similarly, the Court of Appeals has refused to imply a private cause of action under § 6(b) of the 1934 Act for violations of Chicago Board of Options rules. *Spicer v. Chicago Bd. of Options Exch., Inc.*, 977 F.2d 255, 265 (7th Cir.1992). Although the plaintiffs in this case are not relying on the same rules at issue in *Spicer* and *Indemnified Capital Inv.*, they have failed to offer a persuasive justification for reaching a different outcome. Thus, we adopt the rationale of these cases and decline to imply a private cause of action into Bylaw 1101 and its Interpretive Notice.

■ The plaintiffs argue, however, that Count V also states a third-party beneficiary claim against Geldermann for breach of its NFA obligations. Under Illinois law (which the parties suggest controls this issue) third-party beneficiaries may bring an action to remedy the breach of a contract only if the parties to the contract specifically intended the outsider to benefit from the agreement. *Golden v. Barenborg*, 53 F.3d 866, 870 (7th Cir.1995) (citing *Carson Pirie Scott & Co. v. Parrett*, 346 Ill. 252, 178 N.E. 498, 501 (1931)). Mere knowledge that a third-party will profit from the agreement is insufficient;

rather, the contracting parties must affirmatively bestow the benefit on the third-party. *Corrugated Paper Products, Inc. v. Longview Fibre Co.*, 868 F.2d 908, 912 (7th Cir. 1989) (discussing New Jersey law and third-party beneficiary law in general). " 'In Illinois, the [required intent] must be evidenced by an express provision in the contract identifying the third-party beneficiary.' " *Washington Nat'l Ins. Co. v. The Administrators*, 2 F.3d 192, 197 (7th Cir.1993) (quoting *Wheeling Trust & Savings Bank v. Tremco, Inc.*, 153 Ill.App.3d 136, 106 Ill.Dec. 254, 257, 505 N.E.2d 1045, 1048 (1987)).

■ The plaintiffs find evidence of such intent in an NFA Bylaw containing broad proclamations concerning the association's desire to protect the investing public, *see* Pls.' Resp., Ex. E (quoting NFA Bylaw 201), and the following language from the Interpretive Notice regarding Bylaw 1101: "the suggested procedures should help foster ... greater protection to the investing public." *Id.*, Ex. D at 3. Such general statements, however, do not demonstrate that NFA members intended to impart third-party beneficiary rights on the plaintiffs. Only if the language of an agreement affirmatively indicates a desire to permit non-parties to enforce its terms will third-party rights be created. For example, in *Spear, Leeds & Kellogg v. Central Life Assurance Co.*, 85 F.3d 21, 26–27 (2d Cir.1996), the Second Circuit construed the NYSE constitution and rules as intending to provide customers of the exchange with the right to force members into arbitration over disputes, since the relevant provisions stated that "any controversy between a member and any other person arising out of the business of such member shall at the instance of any such party be submitted for arbitration," and "any dispute, claim or controversy between a non-member and a member arising in connection with the business of such member shall be arbitrated under the Constitution and Rules of the [NYSE] ... upon the demand of the non-member." (ellipses omitted). In contrast, the brief quotes from the NFA Bylaw and Interpretive Notice relied upon by the

---

12. Pls.' Resp., Ex. D (quoting 1987 Interpretive Notice).

plaintiffs in this case do not indicate that non-parties have the right to seek private judicial remedies to enforce the agreement. Without such language, the plaintiffs cannot claim third-party beneficiary status. *See O'Connor v. R.F. Lafferty & Co., Inc.*, 965 F.2d 893, 902 (10th Cir.1992) (concluding that introducing broker could not enforce arbitration agreement between investor and clearing broker); *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities*, 748 F.2d 774, 781 (2d Cir.1984) (suggesting that customer did not have third-party beneficiary rights under membership agreement of New York Mercantile Exchange); *Bernstein v. Lind–Waldock & Co.*, 153 Ill.App.3d 108, 106 Ill.Dec. 323, 325, 505 N.E.2d 1114, 1116 (1987) (holding that agreement between Chicago Mercantile Exchange and its members did not impart direct benefit to non-party clearing member of Exchange).[13] Accordingly, as the plaintiffs may not bring a private cause of action for an alleged breach of NFA Bylaw 1101 or its 1987 Interpretive Notice, we grant the defendant's motion to dismiss Count V.

### C.  Section 10(b) of 1934 Act and SEC Rule 10b–5 (Count VI)

Geldermann next seeks dismissal of Count VI, in which the plaintiffs charge all defendants with violating Section 10(b) of the 1934 Act and Rule 10b–5. Specifically, the plaintiffs contend that "Collins and his selling agents intentionally created the false appearance of a large, profitable and legitimate pool which was used as the vehicle for a Ponzi scheme, and by no later than May 1990, Geldermann became a direct participant in the scheme to defraud." Compl. ¶ 84. Plaintiffs maintain that they relied upon this false appearance of legitimacy when deciding to invest with Collins, and thus were damaged by Geldermann's participation in the scheme. Compl. ¶¶ 85–86. The defendant contends, however, that these allegations do not state a claim under § 10(b) or Rule 10b–5 because

they do not suggest a material misrepresentation or omission on the part of Geldermann. Thus, Defendant argues, Count VI's charge that Geldermann was a "participant in the scheme" is simply an attempt to impose aider and abettor liability on Geldermann, an avenue not available to the plaintiffs after *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). The plaintiffs essentially concede that Geldermann did not make any misrepresentations to them, Pls.'s Resp. at 34–36, but argue nonetheless that the defendant's participation in the Collins scheme is sufficient to impose 10b–5 liability.

We begin our analysis with the text of the statute and regulation at issue. Section 10(b) of the 1934 Act states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
>
> . . . .
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe.

15 U.S.C. § 78j. As the statute provides little guidance on the types of "manipulative or deceptive device[s] or contrivance[s]" that are prohibited, the SEC has promulgated the following interpretation of § 10(b):

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,

---

**13.** Moreover, it would be difficult to reconcile the rejection of an implied private right of action under *Spicer* and *Indemnified Capital* with a rule permitting non-parties of the NFA to bring third-party beneficiary claims for breach of the same agreement. *See Salzmann v. Prudential Sec. Inc.*, No. 91 Civ. 4253 (KTD), 1994 WL 191855, at *8

(S.D.N.Y. May 16, 1994); *Bloch v. Prudential–Bache Sec.*, 707 F.Supp. 189, 195–96 (W.D.Pa. 1989) (allowing third-party beneficiary claims under NYSE and NASD rules "seems incongruous with the large body of case law holding that no private cause of action exists for violation of the rules of self-regulatory organizations").

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. Although Congress did not provide a private right of action for § 10(b) violations, the Supreme Court has implied such a cause of action into the 1934 Act. *Superintendent of Ins. of New York v. Bankers Life & Casualty Co.*, 404 U.S. 6, 13, n. 9, 92 S.Ct. 165, 169, n. 9, 30 L.Ed.2d 128 (1971). In *Central Bank of Denver*, however, the Court severely restricted the types of actions that could be brought under § 10(b). Specifically, the Court held that the language of § 10(b) could not be read to imply a private cause of action against those who merely "aid and abet" a § 10(b) violation; rather, the statute prohibited "only the making of a material misstatement (or omission) or the commission of a manipulative act." 511 U.S. at ——, 114 S.Ct. at 1448. Thus, after *Central Bank of Denver* only those persons who performed the acts specifically proscribed § 10(b) of the statute—i.e., "primary violators"—can be the focus of a private damage action.

■ Understandably, the plaintiffs do not style Count VI against Geldermann as a claim for aiding and abetting Collins' fraudulent acts. Rather, the plaintiffs contend that Geldermann is primarily liable for their losses under § 10(b) and Rule 10b–5. "To state a valid Rule 10b–5 claim, a plaintiff must

allege that the defendant (1) made a misstatement or omission, (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of securities, (5) upon which the plaintiff relied, and (6) that reliance proximately caused the plaintiff's injuries." *In Re HealthCare Compare Corp. Sec. Litig.*, 75 F.3d 276, 280 (7th Cir.1996). Notably absent from the complaint is any allegation that Geldermann actually made material misstatements to the plaintiffs, or failed to disclose certain information when duty-bound to do so. The plaintiffs contend that notwithstanding the above quoted language (and the legion of cases containing similar declarations), no such allegations are required for claims brought under Rules 10b–5(a) and (c), so long as the complaint alleges that the defendant employed a "device, scheme, or artifice to defraud," or "engage[d] in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person," 17 C.F.R. § 240.10b–5(a), (c).[14]

■ In support, the plaintiffs rely on cases that separately lay out the requirements of Rule 10b–5(a), 10b–5(b), and 10b–5(c). *E.g., Seeman v. Arthur Andersen & Co.*, 896 F.Supp. 250, 256 (D.Conn.1995); *Adam v. Silicon Valley Bancshares*, 884 F.Supp. 1398, 1400 (N.D.Cal.1995); *Spicer v. Chicago Bd. Options Exch.*, No. 88 C 2139, 1992 WL 380929, at *4–10 (N.D.Ill. Dec. 10, 1992). From this, the plaintiffs infer that primary liability under Rule 10b–5 does not require a misstatement or omission of material fact, but only the defendant's "participation" in a scheme to defraud.[15] There is some appeal to this argument, especially in light of the Supreme Court's rejection of the notion that a defendant must make an affirmative misstatement in order for Rule 10b–5(a) and 10b–5(c) liability to attach. *See Affiliated*

---

**14.** The plaintiffs do not contend that Geldermann employed a "manipulative" device prohibited by § 10(b). *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476, 97 S.Ct. 1292, 1302, 51 L.Ed.2d 480 (1977) ("Manipulation is virtually a term of art when used in connection with securities markets. The term refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity.") (citations and quotations omitted).

**15.** We suspect that the absence of any specific discussion in these cases on the exact contours of primary liability stems from the fact that "[t]his issue was less important before 1994, for secondary-liability doctrines then were available more readily. The line between primary and secondary liability was muddled before the Supreme Court spoke [in *Central Bank of Denver*]." 5B Arnold S. Jacobs, *Litigation and Practice Under Rule 10b–5* § 40.01, at 2–417 (1996) (hereinafter "Jacobs").

*Ute Citizens of Utah v. United States*, 406 U.S. 128, 152–54, 92 S.Ct. 1456, 1471–72, 31 L.Ed.2d 741 (1972). However, upon further examination, it becomes clear that the plaintiffs seek to stretch 10b–5 beyond its text and accompanying case law. Although subsections (a) and (c) do not explicitly require misstatements or omissions, the schemes and practices prohibited by 10b–5 are necessarily those of a *fraudulent* nature. In other words, just as with common-law fraud claims, 10b–5 claims must allege either (1) material misstatements or (2) material omissions by a person having a duty to disclose. *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 474–75, 97 S.Ct. 1292, 1301–02, 51 L.Ed.2d 480 (1977); *Lycan v. Walters*, 904 F.Supp. 884, 900–01 & n. 12 (S.D.Ind.1995) (noting connection between § 10(b) and common-law fraud, and rejecting argument that those who merely assist in fraudulent scheme are liable); *In re MTC Elec. Tech. Shareholders Litig.*, 898 F.Supp. 974, 987 (E.D.N.Y.1995) ("[I]f *Central Bank* is to have any real meaning, a defendant must actually make a false or misleading statement in order to be held liable under Section 10(b)."); *Stack v. Lobo*, 903 F.Supp. 1361, 1374 (N.D.Cal.1995) (rejecting "scheme to defraud" allegations as insufficient under § 10(b)); *In re Valence Tech. Sec. Litig.*, No. C95–20459 JW, 1996 WL 37788, at *10–11 (N.D.Cal. Jan. 23, 1996) (same); *S.E.C. v. U.S. Environmental, Inc.*, 897 F.Supp. 117, 120 (S.D.N.Y.1995) ("The defendant's 'personal involvement in a scheme or plan' to violate the Securities Acts, without more, is insufficient."); *Continental Casualty Co. v. State of New York Mortgage Agency*, No. 94 C 1463, 1994 WL 532271, at *2–3 (N.D.Ill. Sept. 26, 1994) (rejecting claim of "device, scheme and artifice" to defraud where plaintiff failed to allege misrepresentation or deception).

█ Indeed, the plaintiffs have not pointed us to any case where the court allowed a Rule 10b–5 claim to proceed, despite the fact that the complaint failed to contain an allegation of material misrepresentation, or an allegation of material omission coupled with a duty to disclose. *Cf. Affiliated Ute Citizens of Utah*, 406 U.S. at 153, 92 S.Ct. at 1472 (sustaining 10b–5 claim because defendants had a duty to disclose their role as market makers).[16] Although the plaintiffs claim that Geldermann can be held liable simply because it was aware of Collins' scheme and profited from his operation of the commodity trading pool, this is simply not the law.

> Section 10(b) is aptly described as a catch-all provision, but what it catches must be fraud. *When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak.*

*Chiarella v. United States*, 445 U.S. 222, 234–35, 100 S.Ct. 1108, 1118, 63 L.Ed.2d 348 (1980) (emphasis added). The plaintiffs have not directed us to any statutory or common law duty requiring Geldermann to divulge its knowledge of the Collins pool, and thus the defendant's mere silence cannot be the peg on which to hang Rule 10b–5 liability.

Our conclusion is consistent with the Supreme Court's statement in *Central Bank of Denver*, that "[a]ny person or entity ... who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b–5, assuming *all* of the requirements for primary liability under Rule 10b–5 are met." 511 U.S. at ——, 114 S.Ct. at 1455 (emphasis in original).[17] The plaintiffs present a compel-

---

**16.** We need not decide whether cases like *Adam*, 884 F.Supp. at 1400–01, correctly interpret Rules 10b–5(a) and (c) to apply to defendants who prepare, endorse, or disseminate misstatements made by others, since even under this more generous standard, the allegations of Geldermann's "participation" are insufficient.

**17.** *See also* Jacobs, § 40.01, at 2–418 to 2–419 (defining scope of primary liability after *Central Bank of Denver:* "Any person who misrepresents a material fact, is actually involved in the preparation or dissemination of misleading materials, states some facts but omits others, or remains completely silent is liable as a primary violator if that person owes a duty under 10b–5 to the plaintiff and the other 10b–5 elements are present. The key to this definition is when a person owes a duty."); Daniel R. Fischel, *Secondary Liability Under Section 10(b) of the Securities Act of 1934*, 69 Cal.L.Rev. 80, 107–108 (1981) (cited in *Central Bank of Denver*, 511 U.S. at ——, 114 S.Ct. at 1455) (advocating liability for accountants and lawyers who make material misrepresentations *and* otherwise meet the requirements of § 10(b)).

ling case that they were treated unfairly; just the same, "[n]ot every instance of financial unfairness constitutes fraudulent activity under § 10(b)." *Chiarella*, 445 U.S. at 232, 100 S.Ct. at 1116–17. The absence of an allegation that Geldermann made a misstatement, or omitted material information it had a duty to disclose, prevents Count VI from stating a claim under § 10(b) of the 1934 Act or Rule 10b–5. Accordingly, Count VI is dismissed.

### D. Control Person Liability Under § 20(a) of 1934 Act (Count VIII)

■ The plaintiffs allege that Geldermann possessed and exercised substantial control over Collins and his employees, and therefore is liable for these individuals' violations of Rule 10b–5(b) as a "control person" under § 20(a) of the 1934 Act.[18] The Seventh Circuit has interpreted the term "control" broadly to include not only the actual direction of the fraudulent actor, but also the exercise of a sufficient degree of indirect discipline or influence over that person. *Harrison v. Dean Witter Reynolds, Inc.*, 79 F.3d 609, 614 (7th Cir.1996) (*"Harrison II"*), *petition for cert. filed*, 65 U.S.L.W. 3017 (U.S. June 27, 1996) (No. 95–2094). In the words of the Court of Appeals:

> We have looked to whether the alleged control-person actually participated in, that is, exercised control over, the operations of the person in general, and, then, to whether the alleged control-person possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised.

*Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir.1992) (*"Harrison I"*) (quoted in *Harrison II*, 79 F.3d at 614), *cert. denied*, 509 U.S. 904, 113 S.Ct. 2994, 125 L.Ed.2d 688 (1993). In *Harrison I* the Court of Appeals reversed a grant of summary judgment for the defendant broker-dealer, concluding that it was for the jury to decide whether the firm exercised enough control over two of its employees to be liable as a "control person." The court based its conclusion on the fact that these employees used the defendants' office space, telephone services, and employee trading accounts in order to perpetuate their Ponzi scheme, and the defendant failed to enforce its own rules to prevent such fraudulent practices. 974 F.2d at 881. The Seventh Circuit later affirmed a jury finding of liability in *Harrison II*, based on these factors and the defendant's failure to detect and halt its employees' fraudulent activities, the complete lack of supervision over their abnormal trading activities, and the firm's refusal to investigate the obvious rule violations committed by its agents. 79 F.3d at 615–17. The court particularly noted the existence of "sufficient evidence for a reasonable jury to determine that had Dean Witter not shut its eyes to the various fraud signs available to it, as it did, the whole scheme could have been detected and shut down by Dean Witter far earlier than when it collapsed." *Id.* at 615.

■ Despite this broad construction of "control," Geldermann argues that the complaint fails to allege enough facts to demonstrate that it actually exercised control over Collins' general operations, or possessed the ability to control Collins' specific acts of fraud. We disagree. The plaintiffs allege that Geldermann allowed Collins to pool investor money in Geldermann accounts, even though the firm should have required Collins to be registered with the CFTC or NFA. Geldermann also provided Collins with a desk and phone on the floor of the exchange, which bolstered his legitimacy with the investing community. Although James Fuller, ConAgra's compliance officer, notified Gel-

---

18. Section 20(a) provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t.

The SEC has defined "control" as "the possession, direct or indirect, of the power to direct or cause the direction of management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 240.12b–2.

dermann's officers about Collins' questionable conduct, these individuals did not pass this information on to CFTC regulators or the investing public, and indeed, actively sought to impede any audit of the Collins pool. Just as in *Harrison I* and *Harrison II*, there are sufficient allegations to support a conclusion that had Geldermann not looked the other way at Collins' rule violations and questionable activities, his Ponzi scheme could have been terminated long before it fell apart.

Geldermann makes much of the fact that the perpetrators in *Harrison* were employees of Dean Witter, while Collins was not an employee of Geldermann. However, Geldermann fails to explain why these labels should make a difference in this case, given the extent of Geldermann's control over and regulation of Collins. Indeed, the defendant's control over Collins was at least as much as, if not more than, that exercised by the defendants in *Harrison*. Geldermann also contends that as a "clearing broker," it cannot exercise the type of control necessary to hold it liable under § 20(a). In support, the defendant points to *Carlson v. Bear, Stearns & Co., Inc.*, 906 F.2d 315, 319 (7th Cir.1990), in which the court rejected a claim of "aid or participation" under the Illinois Securities Act of 1953 against a clearing broker, based on the fact that the broker merely provided "[m]inisterial or operational duties such as the bookkeeping functions." In dicta, the court mentioned that the federal securities laws would not impose control person liability on an entity "performing operational or ministerial duties." *Id.* at 318. However, to the extent *Carlson* informs our interpretation of § 20(a), it does not doom the plaintiffs' claim.

Rather, *Carlson* makes clear that the nature of the duties performed by the defendant, and not the label placed on the relationship between the defendant and the primary perpetrator, determines liability as a control person.[19] For the reasons already discussed, we believe the plaintiffs have adequately alleged the relationship needed to state a claim under § 20(a).

In sum, based on *Harrison I* and *Harrison II*, we cannot say as a matter of law that the allegations in Count VIII are insufficient to hold Geldermann liable as a "control person." Accordingly, we deny the defendant's motion to dismiss this count.

### E. Aiding and Abetting RICO Violations (Count IX) [20]

In what has become commonplace in securities fraud actions, the plaintiffs also accuse the defendants of violating the civil provisions of RICO, 18 U.S.C. §§ 1962, 1964(c). Specifically, the plaintiffs contend that the defendants violated § 1962(c), which provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, *to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity* or collection of unlawful debt.

18 U.S.C. § 1962(c) (emphasis added). Paragraphs 100–103 of the complaint allege that Lake States constituted a RICO enterprise, and that Collins conducted and participated in the conduct of the affairs of this enterprise through a pattern of racketeering activity

---

**19.** Nor are we persuaded by the court's discussion of this issue in *Damato v. Merrill Lynch, Pierce, Fenner & Smith*, 878 F.Supp. 1156, 1160 (N.D.Ill.1995). *Damato* relied on *Carlson* to support the assertion that a defendant-clearing agent could not be liable under § 20(a), but as mentioned above, this discussion in *Carlson* was dicta. Moreover, the plaintiffs in *Damato* based their control person theory solely on the defendant's ability to refuse to process the rouge trader's transactions. In this case, the plaintiffs rely on Geldermann's duty to regulate and supervise its accounts, its promotion and support of Collins' trading activities, and its refusal to investigate Collins after receiving reliable information

of his misconduct. Thus, regardless of whether we agree with *Damato*, based on the allegations presented by the plaintiffs here, we do not believe Count VIII is subject to dismissal.

**20.** The plaintiffs indicated in their response to the instant motion that all the complaints would eventually contain a § 1962(d) RICO conspiracy claim, and argued the merits of such a claim. Pls.' Resp. at 41 n. 33. However, the second amended complaints filed in the various cases do not contain a § 1962(d) claim, and thus we shall not consider the viability of such a cause of action.

consisting of numerous acts of securities fraud and mail fraud. In paragraph 105, the plaintiffs allege that Geldermann

aided and abetted Collins' pattern of racketeering activity because:

(a) It had knowledge of his objective—to create the false appearance of a large, profitable and legitimate pool in order to induce sales of securities;

(b) It had a desire to help him attain that objective, motivated by the ability to earn much higher commissions than it would otherwise have earned if Collins was only trading his own money; and

(c) With a general knowledge of its role in the violation, Geldermann knowingly rendered substantial assistance by reinforcing the false appearance of legitimacy and profitability by: (i) providing Collins with a Geldermann trading desk and phone; (ii) allowing him to use the Geldermann accounts to conduct illegal, unregistered pool activites; (iii) violating regulatory bylaws and regulations designed to protect the investing public; (iv) allowing the Heinold name to be used in representations regarding the size and profitability of the Pool; and (v) directing its own compliance officer to refrain from conducting an investigation which would have disclosed the full scope of the fraud.

■ These allegations are contained in Count IX, which is styled as a claim of "Aiding and Abetting Violations of RICO § 1962(c)." Geldermann maintains that no such cause of action exists, since § 1962(c) does not contain any language imposing liability on those who aid or abet the RICO violations of others. In light of *Central Bank of Denver*, 511 U.S. at —— — ——, 114 S.Ct. at 1445–48, the defendant argues, the absence of such a cause of action in the text of the statute is fatal to the plaintiffs' claim.

To the extent the plaintiffs are seeking to hold Geldermann liable for aiding and abetting Collins' § 1962(c) violations, we agree. Under the reasoning of *Central Bank of Denver*, absent some ambiguity in a statute, our obligation as an Article III court is to interpret and apply the law as Congress has written it, and not to imply private causes of action merely to effectuate the purported purposes of the statute. Section 1962(c) does not mention aiders and abettors, just as the text of the 1934 Act does not include any suggestion of aiding and abetting liability. Just as in *Central Bank of Denver*, 511 U.S. at ——, 114 S.Ct. at 1447, this silence "bodes ill" for the plaintiffs. Because Congress knows how to impose aiding and abetting liability, 511 U.S. at ——, 114 S.Ct. at 1448, we can assume that if the legislature had intended to hold aiders and abettors of § 1962(c) accountable, then it would have included such language in that subsection of the statute.[21] Therefore, to the extent the plaintiffs seek to recover from Geldermann because it allegedly "aided and abetted" Collins' § 1962(c) violations, this claim must be dismissed because no such cause of action exists under RICO. *Department of Economic Dev. v. Arthur Andersen & Co. (U.S.A.)*, 924 F.Supp. 449, 475–77 (S.D.N.Y.1996); *see also* Carrie E. Goodwin, Note, Central Bank v. First Interstate Bank: *Not Just the End of Aiding and Abetting Under Section 10(b)*, 52 Wash & Lee L.Rev. 1387, 1427–29 (1995) (applying reasoning of *Central Bank* to § 1962(b)–(c)).

Plaintiffs seek to avoid this result by pointing to *Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., Inc.*, 46 F.3d 258, 270–71 (3d Cir.1995), a case decided after *Central Bank of Denver* which discusses aiding and abetting liability in the context of RICO.[22] Although the defendants try to undermine *Jag-*

**21.** Indeed, § 1962(a) references 18 U.S.C. § 2, the general criminal aiding and abetting statute, in its definition of those persons who can be held liable under that provision. Thus, the absence of such language in § 1962(c) is especially damning to a claim of aiding and abetting a violation of that subsection.

**22.** The plaintiffs also cite *Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1410 (11th Cir.1994), as a post-*Central Bank of Denver* deci-

sion. However, that panel opinion was decided two weeks before *Central Bank of Denver*, and does not address the concerns raised by the Supreme Court in that case. Even though the opinion was subsequently modified on rehearing, 30 F.3d 1347 (11th Cir.1994), the modification did not address *Central Bank of Denver* or the portions of the original opinion dealing with aiding and abetting.

*uar Cars* by noting that the opinion does not even discuss *Central Bank of Denver*, we believe there is a better reason not to apply *Jaguar Cars* as the plaintiffs suggest. A closer reading of the case indicates that the Third Circuit was not considering a claim that the defendant aided and abetted a § 1962(c) violation, since the defendant had been actively involved in the management and operation of the RICO enterprise and was being pursued as a primary violator of § 1962(c). *See id.* at 270–71. Rather, to the extent aiding and abetting was even an issue, the case involved the court's review of the evidence supporting the jury's finding that the defendant committed *the predicate acts* of aiding and abetting mail fraud. *Id.* The court did not consider the impact of *Central Bank of Denver* because the case was inapposite to the claims actually raised by the plaintiff.

However, this is not to say that *Jaguar Cars* is wholly irrelevant to the instant case. Although the plaintiffs' complaint and response to the instant motion are not entirely clear, they can be read to assert a claim similar to that raised in *Jaguar Cars*—that is, that Geldermann violated § 1962(c) by conducting and participating in the conduct of the Lake States enterprise through its aiding and abetting of Collins' securities and mail fraud. Given that dismissal of a claim is inappropriate unless its invalidity is beyond doubt, *see MCM Partners, Inc. v. Andrews–Bartlett & Assocs., Inc.*, 62 F.3d 967, 972 (7th Cir.1995), we must consider whether this alternative view of the allegations states a claim under § 1962(c).

As discussed above, liability under § 1962(c) flows only to those employees and associates of an enterprise who "conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." In *Reves v. Ernst & Young*, 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), the Supreme Court held that in order to be liable under § 1962(c), the defendant must have "participated in the operation or management of the enterprise itself," *id.* at 183, 185, 113 S.Ct. at 1172, 1173, and must have played "*some* part in directing the enterprise's affairs," *id.* at

179, 113 S.Ct. at 1170 (emphasis in original). These rather stringent requirements have since been interpreted by the Seventh Circuit as only applying to "outsider" defendants, like the accounting firm at issue in *Reves. MCM Partners*, 62 F.3d at 978–79 (agreeing with *United States v. Oreto*, 37 F.3d 739, 750 (1st Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1161, 130 L.Ed.2d 1116 (1995)). In contrast, where the defendant is alleged to be a "lower-rung participant[ ] in the enterprise ... under the direction of upper management," the absence of any authority or power to control the conduct of the enterprise will not bar application of § 1962(c). *MCM Partners*, 62 F.3d at 978 (quoting *Reves*, 507 U.S. at 184, 113 S.Ct. at 1173); *see also Terrell v. Childers*, 920 F.Supp. 854, 862–64 (N.D.Ill.1996).

Our review of the complaint leads us to conclude that, similar to the accountants in *Reves*, Geldermann was an "outsider" of the alleged RICO enterprise. Paragraph 100 of the complaint alleges that Lake States was the RICO enterprise, and only Collins is alleged to have conducted and participated in the conduct of that enterprise's affairs. There is no indication that Geldermann took directions from Collins or Lake States, or that Geldermann was somehow a "lower-rung participant" in the enterprise. At best, the plaintiffs allege that Geldermann ignored Collins' suspicious behavior in order to maximize its profits. Similar to the defendants at issue in *Reves* and *Terrell*, Geldermann is alleged to be simply an outsider that provided services to Collins and Lake States.

While such persons can be liable under § 1962(c) if they direct the affairs of the enterprise, the allegations in this case are woefully inadequate to support such a contention. The plaintiffs allege that Geldermann bolstered Collins' legitimacy by (1) giving him access to a phone on the floor of the exchange, (2) allowing him to use Geldermann accounts without proper registration, (3) acquiescing in his use of a phoney Heinold statement, and (4) telling its compliance officer to back off his investigation of Collins. Although these acts and omissions are not commendable, neither do they demonstrate that Geldermann directed the affairs of Lake

States. *See Baumer v. Pachl,* 8 F.3d 1341, 1344–45 (9th Cir.1993) (providing legal services to enterprise did not satisfy "operation or management" test of *Reves* ); *Stone v. Kirk,* 8 F.3d 1079, 1092 (6th Cir.1993) (sales representative did not participate in "operation or management" or enterprise). The fact that Geldermann's services were essential to Collins' scheme is irrelevant, since it is not the importance of such services that determines § 1962(c) liability, but whether the provision of these services allows the defendant to direct the affairs of the enterprise. *See University of Maryland at Baltimore v. Peat, Marwick, Main & Co.,* 996 F.2d 1534, 1539 (3d Cir.1993); *Tonnemacher v. Sasak,* 859 F.Supp. 1273, 1277 (D.Ariz.1994). In sum, the plaintiffs' allegations are insufficient to demonstrate that Geldermann directed the affairs of Lake States, and therefore they have failed to state a claim under § 1962(c).[23] Accordingly, the RICO claim in Count IX is dismissed.[24]

### F. Statutory and Common Law Fraud (Counts X and XI)

The plaintiffs also allege that Geldermann is liable under the Illinois Consumer Fraud Act, 815 ILCS 505/1–505/12, and the common law tort of fraud. They contend that Collins and the individual defendants fell within the purview of the Consumer Fraud Act by selling interests in the Collins pool, Compl. § 108, and that they intentionally created the false appearance of legitimacy and profitability through the use of material misrepresentations and deceptive practices, Compl ¶¶ 109, 113. As to Geldermann, the complaint alleges that this defendant accepted the benefits of this fraud—commissions on the purchases and sales of commodity contracts—while having full knowledge of their derivation from Collins' fraud. *Id.* ¶¶ 110, 115. Because of the defendants' fraudulent actions, the plaintiffs claim they made the mistake of investing in the Collins pool.

■■ Geldermann challenges Counts X and XI by asserting that (1) it did not know Collins and Lake States were committing a fraud, (2) it did not accept any money directly from the plaintiffs, and (3) it did not provide substantial assistance to Collins and Lake States in the perpetuation of their fraud.[25] With regard to the first issue, Geldermann seems to argue that the plaintiffs must allege facts showing that it had knowledge of the fraud. Federal Rule of Civil Procedure 9(b) requires that "the circumstances constituting fraud … be stated with particularity," and "knowledge, and other condition of mind may be averred generally." However,

[w]ith respect to securities fraud cases, Rule 9(b) requires that the essential element of scienter be pled with a sufficient level of factual support: "the complaint … must afford a basis for believing that plaintiffs could prove scienter." *DiLeo v.*

---

**23.** This conclusion is not inconsistent with our finding that the plaintiffs have adequately alleged the defendant to be a "control person" under § 20(a) of the 1934 Act. That conclusion is based on the allegations in the complaint indicating that Geldermann exercised general control over Collins and possessed the power or ability to control his fraudulent activity. In contrast, § 1962(c) liability cannot be imposed on Geldermann because there are no allegations that this defendant directed the affairs of Lake States, the RICO enterprise alleged in this case.

**24.** Given this conclusion, we need not address the other thorny issues associated with this theory of recovery, such as the propriety of using aiding and abetting a securities violation as a predicate act under § 1962(c), *compare Bowdoin Construction Corp. v. Rhode Island Hosp. Trust Nat'l Bank, N.A.,* 869 F.Supp. 1004, 1009 (D.Mass.1994) ("any allegations of aiding and abetting securities fraud cannot constitute predi-

cate acts under RICO"), *with Dayton Monetary Assocs. v. Donaldson, Lufkin & Jenrette Sec. Corp.,* No. 91 Civ 2050 (LLS), 1995 WL 43669, at *4–5 (S.D.N.Y. Feb. 2, 1995) (allowing aiding and abetting securities fraud as predicate act); *131 Main St. Assocs. v. Manko,* 897 F.Supp. 1507, 1529 n. 20 (S.D.N.Y.1995) (same), as well as the validity of using *any* aiding and abetting charge as a predicate act after *Central Bank of Denver, see Succession of Wardlaw, through Owen v. Whitney Nat'l Bank,* Civ.A. No. 94–2026, 1994 WL 577442, at *6 (E.D.La. Oct. 17, 1994) (declining to read *Central Bank* so broadly); *Manko,* 897 F.Supp. at 1528 n. 17.

**25.** Although the elements of a Consumer Fraud Act claim and a common law fraud claim are slightly different, *see Siegel v. Levy Organization Dev. Co.,* 153 Ill.2d 534, 180 Ill.Dec. 300, 304, 607 N.E.2d 194, 198 (1992), these differences have no bearing on the challenges raised by Geldermann.

*Ernst & Young,* 901 F.2d 624, 629 (7th Cir.), *cert. denied,* 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990).

*In re HealthCare Compare Corp. Sec. Litig.,* 75 F.3d 276, 281 (7th Cir.1996). In the instant case, the plaintiffs specifically allege that Geldermann knew the Collins pool contained third-party funds obtained through deception. Compl. ¶¶ 110, 115. The plaintiffs also allege that Geldermann acquired such knowledge after taking control of Heinold's account records and employees. *Id.* ¶¶ 23–28. Geldermann's knowledge is also based on the investigation conducted by Fuller, and Geldermann's monitoring of the CFTC investigation into Collins and Lake States. *Id.* ¶¶ 32–40. Finally, Geldermann is alleged to have been aware of the allegations at issue in *Collins v. C.F.T.C.,* 737 F.Supp. 1467 (N.D.Ill.1990)—specifically, that Collins endorsed Geldermann checks over to third-parties and used a bogus Heinold account statement to solicit other investors. Compl. ¶¶ 38–39. In sum, we find the complaint's allegations of knowledge sufficiently detailed to survive Rule 9(b).[26]

■■■■■ Geldermann also contends that it never took any of the plaintiffs' money directly, and therefore cannot be held liable for Collins' fraud. However, under Illinois law a person "who accepts the fruits of fraudulent conduct is also guilty of that fraud." *Shacket v. Philko Aviation, Inc.,* 590 F.Supp. 664, 668 (N.D.Ill.1984) (citing *Cenco Inc. v. Seidman & Seidman,* 686 F.2d 449, 452–53 (7th Cir.), *cert. denied,* 459 U.S. 880, 103 S.Ct. 177, 74 L.Ed.2d 145 (1982), and summarizing Illinois authority). The plaintiffs allege that Geldermann received substantially increased commissions by virtue of Collins' scheme, since he was able to trade more than just his own money. Compl. ¶¶ 58(b), 65(b), 72(b). Indeed, Geldermann executives are alleged to have told Fuller to back off his investigation of Collins because their customer "had a lot of money to trade." Compl. ¶ 32. Although in contrast the plaintiffs in *Armstrong v. Edelson,* 718 F.Supp. 1372, 1377 (N.D.Ill. 1989) and *Heastie v. Community Bank of Greater Peoria,* 690 F.Supp. 716, 721–22 (N.D.Ill.1988) made payments directly to the defendant accused of benefitting from the fraud, we do not believe this distinction makes a difference. Rather, because Geldermann is alleged to have knowingly accepted the benefits of Collins' fraudulent conduct, the plaintiffs have stated a claim against that defendant.[27]

Finally, Geldermann claims that it did not provide substantial assistance to Collins and his scheme, but merely allowed him to use its services and position on the exchange to carry out his fraud. At bottom, Geldermann's argument is that it should not have been required to terminate its lucrative relationship with Collins simply because it may have known he was conducting trades illegally and pooling money fraudulently. We find little merit to this argument, and indeed, Geldermann proffers no authority to support it. If Geldermann knew it was receiving a substantial benefit from Collins' fraudulent activity, and continued to willingly receive its commissions despite this knowledge, we can find no reason why this defendant could not be held liable under Illinois law.[28] Accord-

---

**26.** Geldermann also contends that its "deliberate ignorance" of the Collins scheme is insufficient to prove knowledge. Suffice it to say that if such conduct is sufficient to impute knowledge under the criminal law, *see United States v. Antzoulatos,* 962 F.2d 720, 724 (7th Cir.) ("It is well settled that wilful blindness or conscious avoidance is the legal equivalent to knowledge."), *cert. denied,* 506 U.S. 919, 113 S.Ct. 331, 121 L.Ed.2d 250 (1992), it is also sufficient to impute knowledge for the purpose of imposing civil liability.

**27.** Geldermann also cites *In re College Bound Consol. Litig.,* No. 93 Civ. 2348 (MBM), 1995 WL 450486, at *12 (S.D.N.Y. July 31, 1995) and *Kas v. Chase Manhattan Bank, N.A.,* No. 90 Civ. 44 (MBM), 1991 WL 275754, at *3 (S.D.N.Y. Dec. 16, 1991), for the proposition that its receipt of commissions was too indirect a benefit to support an allegation of scienter. However, these cases do not involve the elements of a claim under the Illinois common law tort of fraud or the Consumer Fraud Act. Moreover, the payment for "professional services" at issue in these cases differs from the commissions Geldermann was allegedly earning on every dollar fraudulent enticed from the plaintiffs.

**28.** This statement should not be read as an endorsement of the plaintiffs' case or their evidence. Rather, given that we must accept the allegations in the complaint as true, we simply cannot say as a matter of law that the plaintiffs will be unable to prevail on their fraud claims against Geldermann.

ingly, we deny the defendant's motion to dismiss Counts X and XI.

## IV. Conclusion

For the reasons set forth above, Geldermann's motion to dismiss is granted with respect to Counts II, III, IV, V, VI, and IX, and denied in all other respects. The parties are directed to appear for a status hearing on August 9, 1996, at 10:00 a.m. to report as to (1) whether in light of this opinion the October 10, 1997 date for filing written pretrial orders should be moved to an earlier date, and (2) whether this is an appropriate time to attempt to settle the remaining claims or establish an alternative dispute resolution procedure. It is so ordered.